75 N.J. Super. 363 (1962)
183 A.2d 161
STATE OF NEW JERSEY, PLAINTIFF,
v.
HUDSON COUNTY NEWS COMPANY, A CORPORATION, DEFENDANT.
Superior Court of New Jersey, Essex County Court, Law Division.
Decided June 26, 1962.
*365 Mr. Maurice McKeown, Assistant Prosecutor, attorney for plaintiff (Mr. Brendan T. Byrne, County Prosecutor of Essex County, attorney).
Mr. Roger H. McGlynn, attorney for defendant (Messrs. McGlynn, Stein and McGlynn, attorneys).
MATTHEWS, J.C.C.
Defendant Hudson County News Company, a corporation of this State, was charged in two indictments returned by the grand jurors of Essex County that it did, without just cause, sell and distribute certain obscene and indecent books and publications in violation of N.J.S. 2A:115-2. The charges contained in the indictments were tried before me without a jury at the request of the corporate defendant and with the consent of the State. A companion indictment, involving one Milton Medwin, which charged that he did, without just cause, possess with intent to utter and expose to view of others, certain obscene and indecent books in violation of N.J.S. 2A:115-2, was not moved for trial with the consent of that defendant and the State.
Defendant is a wholesale distributor of magazines and paper covered books. In the course of its operations, it services a large portion of the northern part of the State, including Essex County. Among the many publications *366 handled by defendant in the course of its business are some 48 magazines,[1] the distribution of which constitutes the basis for the charges contained in the indictments presently under consideration. Defendant does not dispute that it handled and distributed the magazines in question. It contends that its distribution of the publications which it concedes it has effected, does not violate the provisions of N.J.S. 2A:115-2, since none of the publications in question is obscene within the meaning of that statute. In the alternative, it is defendant's contention, should this *367 court determine all or any of the publications to be obscene, the State has failed to establish beyond a reasonable doubt that it distributed any of such publications with the knowledge that the contents thereof were obscene within the meaning of N.J.S. 2A:115-2.
Prior to trial, defendant moved to dismiss the present indictments on constitutional grounds. A determination by the trial court that the indictments should proceed to trial was affirmed by the Supreme Court in State v. Hudson County News Co., 35 N.J. 284 (1961). In its opinion, the court upheld the validity of N.J.S. 2A:115-2 with respect to the challenges made by defendant, on appeal, concerning the constitutionality of that statute. It was the determination of the Supreme Court that N.J.S. 2A:115-2 required the State to show that a defendant charged with a violation of its provisions acted with knowledge of the character or content of the materials claimed to be obscene. The court also determined that the phrase "without just cause" as contained in the statute was not violative of due process requirements in that it was too vague.
In its appeal to the Supreme Court, defendant did not deal, in any manner, with the definitions of obscenity nor the standards to be applied in determining whether materials challenged come within the statutory prohibition. The question has been raised here for the first time. Defendant did not question nor does it question here in anywise the constitutional sufficiency under our State Constitution or under the Federal Constitution of the statutory provisions here involved that it shall be criminal to knowingly sell (or possess with intent to sell) obscene material.
Defendant argues that the concept of obscenity as embraced by our statute must conform to the holding of the Supreme Court of the United States in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Under the holding of the Roth case, defendant contends that the materials upon which the charges in the *368 instant indictments are based cannot be regarded as being obscene.
In Roth the Supreme Court of the United States decided that obscenity is not within the area of constitutionally protected speech or press. This holding was based upon the conclusion that obscenity is no essential part of any exposition of ideas, and is of such slight social value as a step to truth that any benefit that might be derived from it is clearly outweighed by the social interest in order and morality. (354 U.S., at p. 485, 77 S.Ct. 1309.) The Supreme Court in its majority opinion defined obscenity, such as is unprotected by the Constitution, as material which deals with sex in a manner appealing to prurient interest (354 U.S., at p. 487, 77 S.Ct., at p. 1310), and further, "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." In a footnote "prurient interest" was defined as: "Itching; longing; uneasy with desire or longing; of persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd * * *" (354 U.S., at p. 487, note 20, 77 S.Ct., at p. 1310). The court stated that it could perceive no significant difference between the meaning of obscenity developed in the case law and the definition contained in the A.L.I. Model Penal Code § 207.10 (2) (Tent. Draft No. 6, 1957). While this observation of the court has been questioned by writers in the field, see, e.g., Lockhart & McClure, "Censorship of Obscenity: The Developing Constitutional Standards," 45 Minn. L. Rev. 5, 56 (Nov. 1960), it is clear that the court intended to cite the A.L.I. definition with approval.
The decision in Roth also involved a decision in the case of Alberts v. State of California. Roth involved the application of the federal obscenity statute, 18 U.S.C.A., § 1461, and Alberts involved the California obscenity law, West's Penal Code Ann. 1955, § 311. The opinion which upheld convictions in the respective courts below embraced *369 both decisions. The court took the opportunity, under these circumstances, to dispel any doubt as to whether the constitutional standards applicable to the several states with regard to their power to punish speech and press offensive to decency and morality, differed in any degree from those imposed upon the Federal Government. In this connection it rejected the argument of the appellant Roth that the federal obscenity statute unconstitutionally encroached upon the power reserved by the Ninth and Tenth Amendments to the states and to the people to punish speech and press offensive to decency and morality, and similarly rejected the argument of the State of California in Alberts that there is greater latitude for state action under the Fourteenth Amendment than is allowed to Congress by the language of the First Amendment to punish such speech and press; the basis for rejecting both arguments was the holding of the court that obscenity is not an expression protected by the First Amendment (354 U.S. 492, 77 S.Ct. 1313).
While it may seem that the definition of constitutionally unprotected obscenity as set forth in the Roth-Alberts opinion has broad boundaries, a careful reading of the opinion at once indicates that such is not the case; the warning by the court concerning the freedoms of speech and press guaranteed under the Constitution indicates quite clearly how narrow the boundaries of that definition are:
"The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. The door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more important interests. It is therefore vital that the standards for judging obscenity safeguard the protection of freedom of speech and press for material which does not treat sex in a manner appealing to prurient interest." (354 U.S., at p. 488, 77 S.Ct., at p. 1311)
Of equal significance is the observation of the court that sex and obscenity are not synonymous:
*370 "However, sex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest. The portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern. * * *" (354 U.S., at p. 487, 77 S.Ct., at p. 1310)
Cf. Times Film Corp. v. City of Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72 (1957); Mounce v. United States, 355 U.S. 180, 78 S.Ct. 267, 2 L.Ed.2d 187 (1957); One, Inc. v. Oelson, 355 U.S. 371, 78 S.Ct. 364, 2 L.Ed.2d 352 (1958); Sunshine Book Co. v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352 (1958); Kingsley International Pictures v. Regents of the Univ. of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959); Smith v. People of the State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).
In State v. Hudson County News Co., supra, Justice Jacobs in his opinion for the court mentioned the imprecise nature of the concept of obscenity in the law. On several occasions, our courts have dealt with violations of the obscenity law, and while each opinion rendered exhibits difficulty in expressing the obscenity concept, in no instance has that statute been questioned as to its constitutional validity. See e.g., State v. Kohler, 40 N.J. Super. 600 (App. Div. 1956), certif. den. 22 N.J. 225 (1956); State v. Weitershausen, 11 N.J. Super. 487 (App. Div. 1951), certif. den. 7 N.J. 79 (1951); cf. Adams Newark Theatre Co. v. City of Newark, 22 N.J. 472 (1956), affirmed 354 U.S. 931, 77 S.Ct. 1395, 1 L.Ed.2d 1533 (1957); Adams Theatre Co. v. Keenan, 12 N.J. 267 (1953); Bantam Books, Inc. v. Melko, 25 N.J. Super. 292 (Ch. Div. 1953), modified 14 N.J. 524 (1954).
In Adams Theatre Co. v. Keenan, 12 N.J. 267 (1953), our Supreme Court noted that by universal agreement one *371 of the narrowly limited classes of speech which is not given the protection of the First Amendment is speech which is outrightly lewd and indecent, and set forth a test for such lewd and indecent expression, borrowed from People v. Wendling, 258 N.Y. 451, 180 N.E. 169, 81 A.L.R. 799 (Ct. App. 1932), to the effect that "[T]he question is whether the dominant note of the presentation is erotic allurement `tending to excite lustful and lecherous desire,' dirt for dirt's sake only, smut and inartistic filth, with no evident purpose but `to counsel or invite to vice or voluptuousness.'" (12 N.J., at p. 273.) The Adame Theatre case was cited with approval in a footnote to the Roth-Alberts decision. (354 U.S., at p. 489, 77 S.Ct., at p. 1311.)
The net result of the decisions referred to is to establish that those matters which are deemed to be obscene as a matter of law are not entitled to constitutional protection, and, consequently, the Federal Government and the several states may properly enact legislation to regulate and punish the publication and dissemination of such material; that the existence of the power to prevent the sale or distribution of obscene matter does not mean that there can be no constitutional barrier to any form of practical exercise of that power. Further, that in determining whether materials are legally obscene, the test to be applied is whether to the average person, applying contemporary community standards, the dominant theme of the material, taken as a whole, appeals to the prurient interests; and finally that such test must be applied to the materials themselves, and not by measuring the effect that the materials may have on any given person or group of persons.
Abstractly, it would appear not difficult to determine, by applying contemporary community standards, whether given materials predominantly by their theme, taken as a whole, appeal to the prurient interest of the average person. When the test is viewed, however, in light of the constitutional guarantee of freedom of speech and expression, *372 the task becomes formidable and, it is suggested, without some further refinement, seemingly impossible of application.
The difficulty in applying the obscenity test arises because of the conflict which actually exists between the role that the law can assume in regulating and controlling that which is obscene as a matter of law, and the demands which are made of the law by various segments of the general public, that it assume a greater role in such regulation and control. Thus, the law which is traditionally preoccupied with our constitutional guarantees of freedom of expression, necessarily must attempt to delineate, as clearly as possible, those areas of expression which cannot be considered to come within the protection of the Constitution. In approaching this task the law, accustomed to enforcing standards of overt behavior or social conduct of individuals, is in the unaccustomed position of attempting to evaluate and control, in effect, individual thinking. Inevitably, in these attempts, the law exhibits preoccupation with concepts appropriate to the regulation of behavior or conduct, such as the effect individual expression may have on the average man.[2] It is this latter *373 preoccupation to which there is an appeal by those members of society who would seek to have the law assume a greater role in regulating, and perhaps punishing, the expressions of individuals which are subjectively regarded as being obscene. In my opinion, the law cannot, under standards now existing, broaden its area of jurisdiction with respect to the regulation and punishment of expression to that which may be regarded as being obscene by subjective standards.
The concept of obscenity, as a general proposition, is purely subjective. That which may appeal to the prurient interest of one may well only titillate or appear to be coarse to another. To a large degree, that which is to be viewed as being obscene is measured by the interior morality of the viewer, and any effort on the part of civil law to control or punish such purely subjective or interior behavior must be regarded as improper. Clearly, the law cannot establish a standard under which it could hope to wipe out all occasions under which individuals might be excited to impure or immoral thoughts; such a task would not only be impossible of achievement but also completely beyond its role. Control or censorship of the expression of ideas must be literally juridical. When it can be shown that literature, speech or entertainment is socially harmful, the government may properly regulate and punish; but government must be prudent and must exercise caution in its method of operation in these areas, lest it become in its *374 effort to control, oppressive to the inalienable right of each man to self-expression and self-determination. The law, unquestionably, can punish any act which tends to corrupt public moral standards, and all acts which have been, under proper standards, ordained to be antisocial, but it cannot, and should not, under any guise, attempt to legislate or regulate interior morality. The area embracing the thoughts and desires of each individual is properly in the realm of the family, the schools, the churches, and the psychiatrists. In a pluralistic society such as ours, it behooves government to maintain a minimum of social morality, or, necessarily, the imposition of the moral standards of one group upon another must result in some curtailment of the free exercise of the standards of the group imposed upon. History has shown us that social morality is seldom encouraged by a strong police arm. Certainly, this is true when one considers the social standards of this generation with regard to sexual morality. How can the law, even if it is conceded that it must seek to maintain moral standards, make demands upon the average person beyond the level of sexual morality which he has learned from his home, church and school? In these observations, the moralists themselves are not in disagreement.[3]
Of course, it cannot be contended that complete objectivity must be achieved in order to apply a constitutionally acceptable test in determining whether a given work is obscene. The test enunciated in Roth-Alberts certainly belies any such utopian achievement; that portion of the test that applies to contemporary community standards must of necessity require certain subjective value judgments. It is clear, however, that the Supreme Court did not intend *375 that the community standard to be used was to be parochial. In view of its determination that the inhibition of the First Amendment applies with equal force to the Federal Government and the several states, the court has implicitly indicated that the contemporary community standard to be applied is that of the national community and not the standard of any individual city, county, or state.
It is my conclusion that N.J.S. 2A:115-2, the statute here involved, must be interpreted to include within its prohibitions only those materials which may be regarded as obscene under a reasonably objective standard which has the widest possible acceptance and which, therefore, probably will most proximately reflect a national contemporary community standard. My study of the field and research of the authorities indicate that such a standard can embrace hard core obscenity or pornography and no more.
In the preface to their book, Pornography And The Law, Eberhard and Phyllis Kronhausen point out that their experience has shown there is confusion as to the meaning and usage, even under the law, of certain words crucial to a clear resolution of the legal concept of obscenity. It is one of the purposes of their book to differentiate between two classes of expression which they have defined as erotic realism and hard core obscenity or pornography. In writing of the two terms, the authors compare them as follows (Ballantine Books ed., 1960, page 18):
"Both the technique and the aim of pornography (hard core obscenity) are diametrically opposed to those of erotic realism, and even when, by the accident of context, the effects are at times identical, it is well to keep in mind that the overall intent is very different.
In pornography (hard core obscenity) the main purpose is to stimulate erotic response in the reader. And that is all. In erotic realism, truthful description of the basic realities of life, as the individual experiences it, is of the essence, even if such portrayals (whether by reason of humor, or revulsion, or any other cause) have a decidedly anti-erotic effect. But by the same token, if, while writing realistically on the subject of sex, the author succeeds in moving his reader, this too, is erotic realism, and it is axiomatic *376 that the reader should respond erotically to such writing, just as the sensitive reader will respond, perhaps by actually crying, to a sad scene, or by laughing when laughter is evoked." (Emphasis added)
Norman St. John Stevas, the English authority in the field, states in his book, Obscenity And The Law (1956):
"The attempt to understand `obscenity' in the terms of a simple definition is fruitless and best abandoned, but when this has been said certain constant elements in its meaning can be isolated. Obscenity has always been confined to matters related to sex or the excremental functions. Although there is an ideological element in the word and it is sometimes used to describe unconventional moral attitudes, the word is normally related to the manner of presenting a theme or idea rather than to the theme itself. A book is usually said to be obscene, not for the opinions which it expresses, but for the way in which they are expressed. Further, `obscene' is an emotive word, conveying a feeling of outrage. Mere offensiveness is not enough to constitute words or books obscene. If `immodest' is taken as the positive, `indecent' may be described as the comparative, and `obscene' as the superlative.
A pornographic book can be easily distinguished from an obscene book. A pornographic book, although obscene, is one deliberately designed to stimulate sex feelings and to act as an aphrodisiac. An obscene book has no such immediate and dominant purpose, although incidentally this may be its effect. A work like Ulysses certainly contains obscene passages, but their insertion in the book is not to stimulate sex impulses in the reader but to form part of a work of art."
Many other authorities[4] may be cited which would indicate agreement with the ideas set forth by the authors just quoted. All of them indicate that that which is pornographic may be identified with some degree of probability and all make it clear that the pornographic in any method of expression is that which is designed in its contents to *377 appeal directly to the erotic emotions of the individual solely for the purpose of their stimulation.[5]
If the statutory definition of obscenity is to be limited to that which is pornographic, as I believe it should, a standard of some stability, though admittedly not perfect, is achieved.[6] It is my belief that it was pornographic expression which the decision in Roth-Alberts concluded was beyond the protection of the Constitution.
*378 A conclusion similar to that herein expressed as to the scope of the legal definition of obscenity has been reached in other jurisdictions. See State v. Jackson, 224 Ore. 337, 356 P.2d 495 (Ore. Sup. Ct. 1960); People v. Richmond County News, Inc., 9 N.Y.2d 578, 216 N.Y.S.2d 369, 175 N.E.2d 681 (Ct. App. 1961); but see: Monfred v. State, 226 Md. 312, 173 A.2d 173 (Ct. App. 1961); but cf. dissenting opinion of Justice Hammond, id., 173 A.2d, at p. 178.
The materials here in question, the titles and publication data of which have been set forth in marginal note (1) of this opinion, may roughly be classified into three groups. The first group contains the majority of the 48 titles, and consists of what might be termed "man's action" or "adventure" magazines. An examination of the contents of these magazines indicates that each contains a series of medium length stories, all of which in some manner deal with themes of beatings, torture, adultery, rape, and heterosexual activities. For example, in the magazine Battle Cry a story in a cold war setting recounts the escapades of American soldiers who are constantly sought out by German frauleins. Another story in this magazine purports to be the autobiographical narration of an escapee of a Korean War Camp. There are described various sadistic beatings received by captured soldiers while in prison, and the relationships between guards and prisoners, which are, to say the least, suggestive. A third story involves another war theme in which a woman prostitutes herself to whoever gets to be the hero of the week by killing the most Japanese. There are many passages in this narration describing the spattering of blood and brutal conduct. Also included in the typical format of these magazines are a few pages of "pin ups" which are made up of photographs of young women clad in scanty bathing suits posed in various positions. Each of these magazines usually contains one article which deals with some supposedly informative theme which, as a general rule, is presented in an extremely superficial *379 and infantile manner. For example, one magazine carries an historical account of the Meiji Empire in Japan. I have no hesitation in classifying each magazine in this group as absolute trash. I am sure that a trained mind could not find diversion or entertainment in reading the contents of any of them.
During the course of the trial the State produced as an expert witness Dr. Gerald Gelber, a psychologist. Prior to trial Dr. Gelber had been given 13 of the 48 exhibits for examination. The books chosen for his examination were, in the estimation of the prosecutor, fair cross-samplings of the entire 48. With regard to the first classification which I have just mentioned, Dr. Gelber indicated that the one thing that stood out in his mind as to this group was not so much the actual description of perverse sexuality, as the general context of sexual themes and brutal themes, one juxtaposed with another; he believed that the highly repetitive nature of this scheme of the magazines indicated that the intent of the publishers was to combine the two, i.e., the sadistic with the sexual.
While I am inclined to agree with Dr. Gelber's general analysis of the various books of this classification, as indicated by his testimony, I do not believe that his observations can support or justify a conclusion such as would take any of the magazines in question out of the area of expression guaranteed protection by the First Amendment. None of them is pornographic. As an individual citizen, I certainly would not recommend the reading of any of these magazines. As a judge, mindful of the constitutional question involved, I find that they do not violate the provisions of N.J.S. 2A:115-2 in that they are obscene, as I conceive that term as a matter of law.
My second classification of the exhibits embraces a few slick paper magazines which might be referred to as the "for men only" type. The obvious intent of these books is to appeal to man's taste for bawdy things and to pander to the cult of pseudo-sophisticates represented by certain *380 members of our male population who conceive the ultimate in values to be the perfect dry martini and a generously endowed, over-sexed female. The general make-up of these magazines consists of short stories involving rather obvious plots which invariably have as their denouement an illicit sexual relationship; some self-styled feature articles on such popularly conceived-to-be important subjects as modern jazz and modern art, none of which demonstrates much originality; a collection of ribald cartoons of fairly obvious off-color subject matters, and a few pages of color and black-and-white photographs of young women in scanty attire. This class of magazines was not regarded by Dr. Gelber as pornographic, and in this conclusion I agree. Certainly, no inducement could be found to read any of these magazines by anyone of intelligence; to my mind they exist as forlorn evidence of the irresponsible efforts of the publishers concerned to contribute to the mediocrity of society. None of the magazines in this classification, however, do I find to be obscene.
The third and last classification of the exhibits includes a collection of magazines colloquially referred to as "girlie" magazines. These books are dedicated to a collection of "pin up" photographs depicting women in various stages of dress and undress, and in scanty bathing suits. In many of the photographs, the breasts and nipples of the model are exposed. Most of the poses are what might be described as provocative, and some, absolutely silly. None of the photographs, however, even suggest heterosexual or homosexual activity, and are all obviously planned for the purpose of displaying in some manner or another the overabundance of certain physical attributes possessed by the model. Most of the photographs I would deem to be vulgar, but none would I deem to be legally obscene or pornographic. These magazines are indicative of the fantasies which a large segment of our population has with regard to sex. The appeal of this type of magazine seems to be a reassurance *381 to the illusion possessed by many of this group that somewhere, for somebody, sex can be a full-time activity.[7]
I do not come to the determination that any of the magazines here involved, for the distribution of which defendant has been indicted, are obscene within the meaning of N.J.S. 2A:115-2, as I have construed that statute herein. I am fully cognizant of the disappointment that this conclusion may well have on some of our citizens who, with the best of intentions, are determined to eliminate such trash from our newsstands and book stores. As an individual, I can sympathize with their desires, but even with such a personal predilection I cannot, under any circumstances, let that intrude upon what I regard to be my clear legal duty.
In a pluralistic society the courts, as I have stated heretofore, cannot and should not become involved in the attempts to improve individual morals, nor should they become involved as arbiters in the war between the literati and the philistines over the standards to which our literature is to adhere. The function of the courts and our law is clear: to provide, insofar as it is humanly possible, a climate free of unnecessary restraints in which our citizens will be able to express themselves without fear. It is, or should be apparent to all that everything we have been, are, or will be as a nation has or will come as the result of the unfettered expression of individual ideas. Responsible citizens should realize that our social freedoms are inextricably bound together so as to constitute a vital whole which is much more than a mere sum of its parts; and that whenever we deal with any area of freedom we are necessarily dealing with this living whole. If we cannot with reasonable certainty know every possible effect that will flow from the regulation of any specific area of social freedom when we consider the whole, self-restraint must be *382 exercised, since unforeseen effects may follow, with the result that the regulation which seemed at the time sensible when viewed as to a part, now acts to harm irreparably the whole. The danger of such consequences can not be over-stated. Considered in this light, it must be agreed that if we are to continue to have the freedom of expression as it has been guaranteed, and which we have cherished since the days of the Revolution, the existence of the type of trash involved here must be tolerated as part of the price which we must pay.
Defendant's motions for judgments of acquittal under indictments 970 and 971, both of the 1959 term, are granted.
NOTES
[1] Action for Men, October 1959, Vol. 3, No. 6; Adventure, December 1959, Vol. 136, No. 2; Adventures for Men, October 1959, Vol. 5, No. 4; Battle Cry, October 1959, Vol. 4, No. 5; Battlefield, November 1959, Vol. 3, No. 5; Bold, December 1959, Vol. 10, No. 6; Cavalcade, November 1959, Vol. 2, No. 7; Challenge for Men, October 1959, Vol. 5, No. 7; Champion, October 1959, Vol. 1, No. 5; Champion, November 1959, Vol. 3, No. 6; Chicks and Chuckles, December 1959, Vol. 5, No. 6; Danger, September 1959, Vol. 1, No. 4; Expose For Men, October 1959, Vol. 3, No. 3; Expose Detective, December 1959, Vol. 3, No. 2; For Men Only, November 1959, Vol. 6, No. 11; Glamorgirl Photography, December 1959, No. 2; Guy-Men's True Adventures, September 1959, Vol. 1, No. 5; Hep, November 1959, Vol. 5, No. 11; Inside Story, November 1959, Vol. 6, No. 1; Jive, November 1959, Vol. 8, No. 11; Ken For Men, November 1959, Vol. 4, No. 6; Male, October 1959, Vol. 9, No. 10; Male, November 1959, Vol. 9, No. 11; Man's Point of View, December 1959, Vol. 9, No. 9; Man's Magazine, November 1959, Vol. 7, No. 11; Man's Adventure, November 1959, Vol. 2, No. 11; Man's Conquest, November 1959, Vol. 5, No. 4; Man's Illustrated, December 1959, Vol. 5, No. 5; Man's World, December 1959, Vol. 5, No. 6; Man's Western, Aug.-Sept. 1959, Vol. 1, No. 1; Men, October 1959, Vol. 8, No. 10; Men In Adventure, November 1959, Vol. 1, No. 4; Mr. December 1959, Vol. 4, No. 2; Nugget, December 1959, Vol. 4, No. 6; Photo Life, December 1959, Vol. 6, No. 8; Play, December 1959-January 1960, Vol. 1, No. 5; Real, December 1959, Vol. 12, No. 2; Real Men, October 1959, Vol. 5, No. 4; Secret Life Confessions, December 1959, Vol. 1, No. 1; Stag, November 1959, Vol. 10, No. 11; TV Girls and Gags, November 1959, Vol. 6, No. 6; The Dude, November 1959, Vol. 4, No. 2; Thrilling Confessions, November 1959, Vol. 1, No. 1; True Adventures, December 1959, Vol. 29, No. 1; Untamed, November 1959, Vol. 1, No. 6; Valor (For Men), August 1959, Vol. 3, No. 2; Valor (For Men), December 1959, Vol. 3, No. 4; Wildcat Adventures, January 1960, Vol. 1, No. 4.
[2] Recognition of this dilemma may be seen in Chief Justice Warren's concurring opinion in Roth-Alberts, 354 U.S., at pp. 494, 495, 77 S.Ct., at p. 1314:

"The line dividing the salacious or pornographic from literature or science is not straight and unwavering. Present laws depend largely upon the effect that the materials may have upon those who receive them. It is manifest that the same object may have a different impact, varying according to the part of the community it reached. But there is more to these cases. It is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture. The nature of the materials is, of course, relevant as an attribute of the defendant's conduct, but the materials are thus placed in context from which they draw color and character. A wholly different result might be reached in a different setting."
An interesting alternative has been suggested by Messrs. Lockhart and McClure in 45 Minn. L. Rev. 5, 77, which they term "variable obscenity." Under this view a material is never inherently obscene; instead its obscenity varies with the circumstances of its dissemination. Basically this suggestion is a further development of alternative (1) "Pandering to Interest in Obscenity" proposed by the A.L.I. in section 207.10 of the tentative draft (No. 6) of the Model Penal Code. The concept is also implicit in the portion of Chief Justice Warren's opinion just quoted. Such an approach to the obscenity problem, I believe, is more in accord with the proper role that the law should assume, since it is human conduct that is involved in this approach. Our present statute does not permit such construction.
[3] St. Thomas Aquinas in Summa Theologica, II-II q 77, art. 1, ad. 1, states:

"Hence human law was unable to forbid all that is contrary to nature; and it suffices it to prohibit whatever is destructive of human intercourse, while it treats other matters as though they were lawful not by approving them, but by not punishing them."
[4] See text and accompanying footnotes in Lockhart & McClure: "Censorship of Obscenity: The Developing Constitutional Standards," 45 Minn. L. Rev. 5, 58-68 (1960); Kilpatrick, The Smut Peddlers, ch. 1; see also, "Obscenity and the Arts," a collection of articles from various viewpoints dealing with the problem in 20 Law and Contemporary Problems, No. 4 (1955).
[5] It should be observed in this connection that the American Law Institute in promulgating its definition of obscenity under section 207.10 of the tentative draft of the Model Penal Code, also had in mind reference to the content of the materials in question and not the tendency or effect of the materials to arouse lustful thoughts or desires. In comment (A), "Summary of the Principal Features," of section 207.10, the Institute pointed out that evidence that change of character or actual misbehavior follows from contact with obscenity is lacking. The purpose of the Institute in using the term "appeal to prurient interest" was to refer to qualities of the material itself, that is, the capacity of the material to attract individuals eager for a forbidden look behind the curtain of privacy which our customs draw about sexual matters. The objective of section 207.10 was stated by the Institute to be the prevention of commercial exploitation of the psychological sexual tension which exists in the ordinary person in our society, who is described by psychiatrists and anthropologists as caught between normal sexual drive and curiosity, on one hand, and powerful social and legal prohibition against overt sexual behavior on the other.
[6] To some, even the limitations placed upon the definition of obscenity as expressed here constitute an unreasonable burden on the guarantees of freedom of expression. Cf. O'Connell, J. dissenting in State v. Jackson, infra, 356 P.2d, at p. 508; Kalven, Book Review in 24 Chi. L. Rev. 769 (1957) (written prior to Roth-Alberts). Such objection presupposes the law to have no voice or interest in the maintenance of even minimum standards of public morality. Such a presupposition is erroneous. See, e.g. Chaplinsky v. New Hampshire, 315 U.S. 568, 571-572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Beauharnais v. Illinois, 343 U.S. 250, 257, 72 S.Ct. 725, 96 L.Ed. 919 (1952). Cf. Trist v. Child, 21 Wall. 441, 88 U.S. 441, 450, 22 L.Ed. 623 (1874):

"The foundation of a republic is the virtue of its citizens. They are at once sovereigns and subjects. As the foundation is undermined, the structure is weakened. When it is destroyed the fabric must fall. Such is the voice of universal history." Swayne, J. quoting 1 Montesquieu, Spirit of Laws, 17
[7] See Eric Larrabee, "The Cultural Context of Sex Censorship," 20 Law and Contemp. Problems 672, 683 (1955).