STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HUDSON COUNTY NEWS COMPANY, ETC., AND HUDSON COUNTY NEWS DEALERS SUPPLY COMPANY, ETC., DEFENDANTS-APPELLANTS.

Argued October 22, 1963—Decided December 16, 1963.

248

Mr. *Roger H. McGlynn* argued the cause for defendants-appellants (*Messsr. McGlynn, Stein & McGlynn*, attorneys; *Mr. Julius Kass*, of the New York Bar, of counsel, and *Mr. Roger H. McGlynn*, of counsel and on the brief).

Mr. *Harold J. Ruvoldt*, Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. James A. Tumulty, Jr.*, Hudson County Prosecutor, attorney; *Mr. William A. O'Brien*, of counsel).

The opinion of the court was delivered by

PROCTOR, J. The defendants, Hudson County News Company and Hudson County News Dealers Supply Co., affiliated corporations, are engaged in the business of distributing to retailers newspapers and magazines of all types over a large area in northern New Jersey. They were charged with violating *N. J. S.* 2A:115–2[1] in five indictments, each of which contained several counts. Four of the indictments charged the defendants with specific sales of obscene magazines and the fifth charged them with possession with intent to sell obscene magazines. The indictments involved 23 different "girlie-type" magazines. The case was tried before a jury and defendants were found guilty on counts involving six of

---

[1] At the time of the indictment *N. J. S.* 2A:115–2 provided: "Any person who, without just cause, utters or exposes to the view of another, or possesses with intent to utter or expose to the view of another, any obscene or indecent book, publication, pamphlet, picture or other representation however made or any person who shall sell, import, print, publish, loan, give away, or distribute or possess with intent to sell, print, publish, loan, give away, design, prepare, distribute, or offer for sale any obscene or indecent book, publication, pamphlet, picture or other representation, however made, or who in any way advertises the same, or in any manner, whether by recommendation against its use or otherwise, gives any information how or where any of the same may be had, seen, bought or sold, is guilty of a misdemeanor."

the magazines.[2]   The Appellate Division affirmed the convictions.   *State v. Hudson County News Co.*, 78 *N. J. Super.* 327 (1963).   Defendants appeal to this court under *Rule* 1:2–1(a).

Defendants first contend that they were entitled to a judgment of acquittal at the end of the State's case on the ground that the magazines involved could not constitutionally be found to be obscene.   In *Roth v. United States*, 354 *U. S.* 476, 77 *S. Ct.* 1304, 1 *L. Ed. 2d* 1498 (1957), the United States Supreme Court held that obscenity is not within the area of constitutionally protected speech or press.   Defendants argue that obscenity, in the constitutional sense, means "hard-core pornography," which they define in their brief as:

"[C]ommercially and clandestinely produced material having no literary or artistic merit in which sexual activities and orgies of men and women, normal and perverted, are portrayed, *devoid of disguise*, through explicit and crude or coarse illustration   *   *   *   'hard core' pornography is instantly recognizable by all.   It constitutes absolute filth in the rawest and starkest sense."   (Emphasis in the original)

We are certain that the First Amendment as interpreted by the United States Supreme Court does not limit this State to the suppression of material which reaches the nadir of degradation described by the defendants.   Certainly the cases and commentators do not adopt or confirm the defendants' suggested definition.   Although several states have limited the meaning of obscenity under their statutes to "hard-core" pornography,[3] we have found no concurrence of opinion re-

[2] The defendants were convicted under four of the indictments of selling the following magazines: *Mermaid*, Vol. 1 No. 6; *Spree*, Vol. 1 No. 9; *High*, July 1959; *Exotic Adventures*, Vol. 1 No. 3; *Sir Knight*, Vol. 1, No. 8.   They were convicted under the fifth indictment of possessing with intent to sell the magazine *Ace*, August 1959.

[3] *E. g.*, *People v. Richmond County News, Inc.*, 9 *N. Y. 2d* 578, 216 *N. Y. S. 2d* 369, 175 *N. E. 2d* 681 (*Ct. App.* 1961); *Zeitlin v. Arnebergh*, 59 *Cal. 2d* 901, 31 *Cal. Rptr.* 800, 383 *P. 2d* 152 (*Sup. Ct.* 1963); *Attorney General v. Tropic of Cancer*, 345 *Mass.* 11, 184 *N. E. 2d* 328 (*Mass. Sup. Jud. Ct.* 1962).   But *cf. State v. Andrews*, 150 *Conn.* 92, 186 *A. 2d* 546 (*Sup. Ct. Err.* 1962); *Monfred v. State*,

garding the meaning of that term.  Dean Lockhart and Professor McClure, in their authoritative article, "Censorship of Obscenity: The Developing Constitutional Standards," 45 *Minn. L. Rev.* 5, 60–61 (1960), state that "a satisfactory definition of the term is not easy to come by."  Other commentators have expressed varying ideas on the meaning of the term, *e. g.,* Kalven, "The Metaphysics of the Law of Obscenity," 1 *Sup. Ct. Rev.* 1, 13, 44 (1960) ; Mulroy, "Obscenity, Pornography and Censorship," 49 *A. B. A. J.* 869, 874 (1963) ; Green, "The Treatment of Obscenity," 51 *Ky. L. J.* 667, 677 (1963).

■ We have also considered the arguments advanced in the cases and in the literature that obscenity is, or may be constitutionally limited to, "hard-core" pornography, but we have concluded that in the absence of any substantial concurrence as to the meaning of this term, its adoption by us at this time would not increase clarity or certainty in the law of obscenity, and accordingly we decline to do so.  We note that two states which have adopted the "hard-core" test have reached opposite results in determining the constitutionality of the suppression of the same book.  Compare *People v. Fritch,* 13 *N. Y. 2d* 119, 234 *N. Y. S. 2d* 1, 192 *N. E. 2d* 713 *(Ct. App.* 1963), with *Attorney General v. Tropic of Cancer,* 345 *Mass.* 11, 184 *N. E. 2d* 328 *(Mass. Sup. Jud. Ct.* 1962).  In short, the label "hard-core" pornography is too vague to be helpful to a court or a jury in determining whether particular material is obscene.

■ We recognize that under any definition of obscenity certain materials will lie in a gray area, and that "constitutionally protected expression   *   *   *   is often separated from obscenity only by a dim and uncertain line."  *Bantam Books, Inc. v. Sullivan,* 372 *U. S.* 58, 66, 83 *S. Ct.* 631, 637, 9 *L. Ed. 2d* 584, 590 (1963).  However, we are of the opinion

226 *Md.* 312, 173 *A. 2d* 173 *(Ct. App.* 1961), *cert.* denied, 368 *U. S.* 953, 82 *S. Ct.* 395, 7 *L. Ed. 2d* 386 (1962) ; *State v. Chobot,* 12 *Wis.* 2d, 110, 106 *N. W. 2d* 286 *(Sup. Ct.* 1960), app. dism. 368 *U. S.* 15, 82 *S. Ct.* 136, 7 *L. Ed. 2d* 85 (1961).

that the guidelines established initially in *Roth* and clarified in *Manual Enterprises v. Day,* 370 *U. S.* 478, 82 *S. Ct.* 1432, 8 *L. Ed. 2d* 639 (1962), are the best determinants available to a court in reaching its decision whether particular material is obscene by constitutional standards.

In *Roth,* Mr. Justice Brennan for the majority of the Court stated that the test of obscenity is:

"whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 *U. S.,* at *p.* 489, 77 *S. Ct.,* at *p.* 1311, 1 *L. Ed. 2d,* at *p.* 1509.

And in discussing the test, he quoted with approval the definition of the A. L. I. Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), *viz.*:

"* * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, *i. e.,* a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters * * *" 354 *U. S.,* at *p.* 486, 77 *S. Ct.,* at *p.* 1310, 1 *L. Ed. 2d,* at *p.* 1508.

This A. L. I. definition was revised in minor part in the 1962 Proposed Official Draft of the Model Penal Code.

Subsequently, in *Manual Enterprises, supra,* Mr. Justice Harlan stated, "obscenity * * * requires proof of two distinct elements: (1) patent offensiveness; and (2) 'prurient interest' appeal." 370 *U. S.,* at *p.* 485, 82 *S. Ct.,* at *p.* 1436, 8 *L. Ed. 2d,* at *p.* 646. The term "patent offensiveness," or "indecency," describes material which can be deemed so offensive on its face as to affront current community standards of decency. *Id.,* 370 *U. S.,* at *p.* 481, 82 *S. Ct.,* at *p.* 1434, 8 *L. Ed. 2d,* at *p.* 644. He also quoted the Model Penal Code definitions and commented that "the thoughtful studies of the American Law Institute reflect the same twofold concept of obscenity." *Id.,* 370 *U. S.,* at *p.* 485, 82 *S. Ct.,* at *p.* 1436, 8 *L. Ed. 2d,* at *p.* 646. Although the opinion of Mr. Justice Harlan (announcing the judgment of the Court) was

joined only by Mr. Justice Stewart,[4] we believe that the requirement of patent offensiveness articulated in that opinion was nevertheless inherent in the *Roth* opinion which approved the twofold concept expressed in the A. L. I. proposal. Indeed, it is the characteristic of indecency which is the basis of society's objection to obscene material, and if the test did not include both elements, many worthwhile works in literature, science, or art would fall under the sole test of "prurient-interest" appeal.[5] In most cases, however, the two elements will tend to coalesce, "for that which is patently offensive will also usually carry the requisite 'prurient interest' appeal." *Id.*, 370 *U. S.*, at *p.* 486, 82 *S. Ct.*, at *p.* 1436, 8 *L. Ed. 2d*, at *p.* 646.

Defendants moved at the end of the State's case for a judgment of acquittal. They argue that the judge was required to make an independent determination of the material in evidence, applying the proper constitutional standards, before submitting the issue of obscenity to the jury. We agree. The trial judge must apply the constitutional standards to the specific material, in the light of any factual findings supported by the evidence, for if in his judgment the material cannot constitutionally be suppressed, then nothing remains for the jury's consideration. See Model Penal Code, Proposed Official Draft 1962 § 251.4(4), where it is said, "The Court shall dismiss a prosecution for obscenity if it is satis-

---

[4] Justice Black concurred in result; the Chief Justice, Justices Brennan and Douglas concurred on procedural grounds; Justice Clark dissented on other grounds; and Justices Frankfurter and White took no part in the decision.

[5] In 1962 our Legislature supplemented our statutes on indecency and obscenity by adding a definition for the word "obscene" substantially in the language of the *Roth* opinion as follows:

"The word 'obscene' whenever it appears in the chapter to which this act is a supplement shall mean that which to the average person, applying contemporary community standards, when considered as a whole has as its dominant theme or purpose an appeal to prurient interest." *N. J. S.* 2A:115-1.1.

This statute must constitutionally be construed to include the element of patent offensiveness.

fied that the material is not obscene." Of course, if the trial judge determines that the material is not constitutionally protected and should be submitted to the jury, he should avoid expressing to them his opinion on the issue of obscenity. Compare *State v. Smith,* 32 *N. J.* 501, 549 (1960), regarding the trial court's function in determining the admissibility of a defendant's confession. Further, on appeal each appellate court must likewise make an independent determination of whether the attacked material is suppressible within constitutional standards, for the question is not merely one of fact "but a question of constitutional *judgment* of the most sensitive and delicate kind." Mr. Justice Harlan concurring in *Roth, supra,* 354 *U. S.,* at *p.* 498, 77 *S. Ct.,* at *p.* 1316, 1 *L. Ed. 2d,* at *p.* 1514. See also *Manual Enterprises v. Day, supra,* 370 *U. S.,* at *p.* 487, 82 *S. Ct.,* at *p.* 1437, 8 *L. Ed. 2d,* at *p.* 647; Lockhart and McClure, *op. cit. supra,* at *pp.* 114–116 and cases there cited.

We have examined the six magazines involved in the defendants' convictions, and we are of the opinion that under the *Roth-Manual* test a trial court could properly submit the issue of their obscenity to the jury.[6] There was accordingly no error in the trial court's denial of defendants' motion for acquittal on this ground.

The defendants further contend that they were entitled to a judgment of acquittal at the end of the State's case on the ground that the State had failed to prove beyond a reasonable doubt that the defendants had knowledge of the contents of the magazines involved. In *State v. Hudson County News Co.,* 35 *N. J.* 284, 294 (1961), we held that *N. J. S.* 2A:115–2 must be construed as though it expressly embodied the word "knowingly," *i. e.,* that *scienter* is an implied element of the statutory offense. Compare *Smith v. California,* 361 *U. S.* 147, 80 *S. Ct.* 215, 4 *L. Ed. 2d* 205

---

[6] A jury could properly find that the dominant themes of the magazines were sexual perversions such as exhibitionism, masochism, flagellation, and nymphomania, that they appealed to prurient interests, were patently offensive, and had no redeeming social importance.

(1959), in which the United States Supreme Court held that a city ordinance prohibiting the keeping for sale of obscene material was unconstitutional because as construed by the state court it eliminated the element of *scienter*.

Defendants argue there was no proof at the end of the State's case that they had actually examined the contents of the magazines here involved. However, "A bookseller may, of course, be well aware of the nature of a book and its appeal without having opened its cover, or, in any true sense, having knowledge of the book." Mr. Justice Frankfurter concurring in *Smith v. California, supra,* 361 *U. S.* 164, 165, 80 *S. Ct.* 224, 225, 4 *L. Ed. 2d* 215, 217.

Actual knowledge of the contents of the material is not the *sine qua non* to establish *scienter*. Otherwise, a bookseller need only close his eyes to the material he handles to avoid prosecution under an obscenity statute. Mr. Justice Brennan in *Smith, supra,* speaking for the Court, indicated that there may be circumstances under which a bookseller or a distributor may be required to investigate material in his control or explain his failure to do so. 361 *U. S.,* at *p.* 154, 80 *S. Ct.,* at *p.* 219, 4 *L. Ed. 2d,* at *p.* 212. We believe such circumstances exist in the present case. In the regular course of business defendants distributed magazines, a cursory inspection of which would have revealed the nature of their contents. The State produced three retailers, customers of the defendants, who testified that on a number of occasions they had complained by phone, in writing, and in person that "girlie magazines" were objectionable and asked that deliveries be stopped; nevertheless, deliveries continued. Under these circumstances, we believe that evidence that the defendants had examined the magazines involved was not necessary to establish a *prima facie* case but that the State could rely on these circumstances to require the defendants to explain their lack of knowledge of the actual contents of the magazines. Compare the presumption suggested by the American Law Institute in the Model Penal Code, 1962 Proposed Official Draft § 251.4(2), *viz.:* "A person who disseminates or

possesses obscene material in the course of his business is presumed to do so knowingly or recklessly." We find that the trial court did not err in denying the defendants' motion to acquit on this ground.

The defendants also contend that the trial court erred in denying their motion for acquittal at the end of the State's case on the indictment which charged them with possession with intent to sell obscene material. The defendants do not contend that *N. J. S.* 2A:115-2 is unconstitutional on its face but that its application under the circumstances was unconstitutional. They claim that they were deprived of their rights under the First and Fourteenth Amendments of the Federal Constitution by the procedures used by the police in confiscating certain magazines from their warehouse and contend that this method of enforcing the statute constituted a prior restraint upon publication.

After having purchased from customers of the defendants the magazines named in the indictments charging defendants with the sale of obscene matter, the police obtained a warrant to search the defendants' warehouse.[7] The premises consisted of an area about 100 feet square in which thousands of magazines and books of all types were stacked on the floor prior to distribution. The detectives advised defendants' manager that they had a warrant to search "for books of obscene nature." They spent two to two and a half hours conducting the search and examining various magazines. Seven detectives made the actual search and brought the magazines they found to the chief detective, who decided whether "they were the type books that we were looking for * * *." At the conclusion of their search, the detectives confiscated seven bundles of 100 copies each of seven magazines—all the copies the defendants had. It should be noted that these magazines were not additional copies of those purchased by the police. Each of the seven titles was named in a

---

[7] The validity of the search warrant is not before us on this appeal, and accordingly we do not consider the question. *Cf. R. R.* 3:2A-1 to 10.

260

separate count of the indictment charging possession, and the bundles were placed in evidence at the trial. Defendants were subsequently convicted on only one count of this indictment which named the August 1959 issue of *Ace*.

Chief Justice Hughes in *Near v. Minnesota*, 283 *U. S.* 697, 713, 51 *S. Ct.* 625, 630, 75 *L. Ed.* 1357, 1366 (1931), pointed out that the chief purpose of the First Amendment guarantee is to prevent previous restraints upon publication. There the Court struck down as unconstitutional a state statute which permitted a prior restraint by injunction on the publication of printed matter. However, it was suggested that an exception to the prior restraint doctrine might exist with regard to the regulation of obscene material. And the Court has subsequently upheld the prior restraint of obscene material under carefully circumscribed procedural safeguards. *Kingsley Books, Inc. v. Brown*, 354 *U. S.* 436, 77 *S. Ct.* 1325, 1 *L. Ed.* 2d 1469 (1957)[8]; *Times Film Corp. v. Chicago*, 365 *U. S.* 43, 81 *S. Ct.* 391, 5 *L. Ed.* 2d 403 (1961). In *Roth*, the Court expressly recognized the vital necessity of adequate safeguards in the application of obscenity statutes to prevent the suppression of constitutionally protected material. 354 *U. S.*, at *pp.* 488, 489, 77 *S. Ct.*, at *pp.* 1310, 1311, 1 *L. Ed.* 2d, at *p.* 1509. Later, in *Smith*, the Court said, "[O]ur holding in Roth does not recognize *any* state power to restrict the dissemination of books which are not obscene." 361 *U. S.*, at *p.* 152, 80 *S. Ct.*, at *p.* 218, 4 *L. Ed.* 2d, at *p.* 210 (emphasis added).

In *Marcus v. Property Search Warrant*, 367 *U. S.* 717, 81 *S. Ct.* 1708, 6 *L. Ed.* 2d 1127 (1961), the Court held that the Missouri procedures for search and seizure of obscene material as applied in that case "lacked the safeguards which due process demands to assure nonobscene material the constitutional protection to which it is entitled." 367 *U. S.*, at *p.* 731, 81 *S. Ct.*, at *p.* 1716, 6 *L. Ed.* 2d, at *p.* 1136. Under

---

[8] Compare New Jersey's recently enacted injunction procedures relating to obscene material. *N. J. S.* 2A:115–3.5 to 3.10.

a Missouri statute, supplemented by rule of court, the police had obtained warrants which authorized them to search the premises of five news retailers and a distributor and to seize obscene materials found therein. On execution of the warrants, all copies of 280 publications were seized at the six places. A hearing on the issue of obscenity was held before a circuit judge pursuant to the statute thirteen days after the search. In an opinion filed over two months after the seizure, the judge held that 100 of the 280 seized items were obscene and ordered that they be held as evidence for possible criminal prosecution. The 180 items found not to be obscene were ordered returned to the owners. The Supreme Court in holding that the First Amendment rights of the appellants had been violated stated:

" '* * * [T]he line between speech unconditionally guaranteed and speech which may legitimately be regulated, suppressed, or punished is finely drawn * * *. The separation of legitimate from illegitimate speech calls for * * * sensitive tools * * *.' *Speiser v. Randall*, 357 *U. S.* 513, 525, 78 *S. Ct.* 1332, 2 *L. Ed.* 2d 1460, 1472. It follows that, under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity as here involved without regard to the possible consequences for constitutionally protected speech. * * * They [the officers conducting the search] were provided with no guide to the exercise of informed discretion, because there was no step in the procedure before seizure designed to focus searchingly on the question of obscenity. See generally 1 Chafee, Government and Mass Communications, pp. 200–218. In consequence there were suppressed and withheld from the market for over two months 180 publications not found obscene. The fact that only one-third of the publications seized were finally condemned strengthens the conclusion that discretion to seize allegedly obscene materials cannot be confided to law enforcement officials without greater safeguards than were here operative. Procedures which sweep so broadly and with so little discrimination are obviously deficient in techniques required by the Due Process Clause of the Fourteenth Amendment to prevent erosion of the constitutional guarantees." *Id.*, 367 *U. S.*, at *pp.* 731–732, 81 *S. Ct.*, at *pp.* 1716–1717, 6 *L. Ed.* 2d, at *pp.* 1136, 1137.

The procedures followed by the detectives in the present case cannot be distinguished from those found constitutionally defective in *Marcus*. Here the detectives exercised the broad-

est discretion in executing the warrant. They were provided with no guide to the exercise of informed discretion but were left to their individual judgments as to which magazines were obscene. In the short time they were at the premises they obviously had little opportunity to reflect or deliberate. The magazines were seized on the basis of on-the-spot *ad hoc* decisions. As a result of the seizures, 600 magazines not found to be obscene were suppressed and withheld from the market for approximately three years. In *Marcus*, the court concluded:

"Mass seizure in the fashion of this case was thus effected without any safeguards to protect legitimate expression. The judgment of the Missouri Supreme Court sustaining the condemnation of the 100 publications therefore cannot be sustained. We have no occasion to reach the question of the correctness of the finding that the publications are obscene. Nor is it necessary for us to decide in this case whether Missouri lacks all power under its statutory scheme to seize and condemn obscene material. Since a violation of the Fourteenth Amendment infected the proceedings, in order to vindicate appellants' constitutional rights the judgment is reversed, \* \* \*" *Id.*, 36 *U. S.*, at *p.* 738, 81 *S. Ct.*, at *p.* 1719, 6 *L. Ed.* 2d, at *pp.* 1139, 1140.

 We believe that the procedures here employed imposed an unconstitutional prior restraint on defendants' rights under the First and Fourteenth Amendments, and since this violation of constitutional rights permeated the proceedings under the indictment charging them with the possession of obscene material, the conviction under that indictment must be reversed.

 Defendants' final argument is that an erroneous community standard was applied in the trial of the case. Over their objection, the trial court admitted testimony of lay witnesses tending to establish that the magazines in evidence were offensive to community standards in Hudson County. The following typical testimony was elicited in response to the court's question requesting the lay witnesses' opinion regarding "morality and immorality in Hudson County":

"* * * the way of life that I have watched and that I have lived within Hudson County and in Jersey City is a very, very high moral standard as compared to other areas that I have visited."[9]

In addition, the court charged the jury, over objection, that they should consider the community standards of Hudson County as testified to by the witnesses.

Defendants urge that the term "contemporary community standards," which was introduced in the test of obscenity in *Roth*, contemplates a national standard of decency, and not a local standard. On the other hand, the State contends that the standard must be that of the local community where the material was distributed.

There has been no United States Supreme Court case which specifically answers this question. However, Dean Lockhart and Professor McClure have stated:

"We are confident that, when the Supreme Court is clearly presented with the issue, the Court will resolve the issue against the application of state and local community standards." *op. cit. supra*, at *pp.* 111–112.

In support of this view they suggest that the ideas embodied in the phrase "contemporary community standards" originated with Judge Learned Hand in his opinion in *United States v. Kennerley*, 209 *F*. 119 (*S. D. N. Y.* 1913). In that

---

[9] Although the matter was not briefed, we do not believe that a lay witness is ordinarily competent to give opinion testimony on community standards. Of course, we do not wish to imply that all evidence of community standards is inadmissible. See the concurring opinion of Mr. Justice Frankfurter in *Smith v. California*, *supra*, 371 *U. S.* 161, 166, 80 *S. Ct.* 223, 226, 4 *L. Ed.* 2d 215, 218; and the concurring opinion of Mr. Justice Harlan in that case, at 361 *U. S.*, at *pp.* 169–172, 81 *S. Ct.*, at *pp.* 227–229, 4 *L. Ed.* 2d, at *pp.* 220, 221. See also *Yudkin v. State*, 229 *Md.* 223, 182 *A.* 2d 798 (*Ct. App.* 1962). *Cf. People v. Finkelstein*, 11 *N. Y.* 2d 300, 229 *N. Y. S.* 2d 367, 183 *N. E.* 2d 661 (*Ct. App.* 1962), cert. denied, 371 *U. S.* 863, 83 *S. Ct.* 116, 9 *L. Ed.* 2d 100 (1962), noted at 76 *Harv. L. Rev.* 1498 (1963).

We note that the State purported to qualify the lay witnesses as "average" men. No witness can *qualify* as an "average man." This is a standard solely for the jury to determine.

case, Judge Hand felt obligated to follow the obscenity test laid down in *Regina v. Hicklin*, [1868] *L. R. 3 Q. B.* 360, which allowed material to be judged by the effect of an isolated excerpt upon particularly susceptible persons. The *Hicklin* test was specifically rejected in *Roth* as unconstitutionally restrictive of the freedoms of speech and press. 354 *U. S.*, at *pp.* 488–489, 77 *S. Ct.*, at *pp.* 1310–1311, 1 *L. Ed. 2d*, at *p.* 1509. In criticizing the *Hicklin* test and urging its abandonment, Judge Hand in *Kennerley* said, "[S]hould not the word 'obscene' be allowed to indicate the present critical point in the compromise between candor and shame at which the *community* may have arrived here and now? * * * To put thought in leash to the *average conscience of the time* is perhaps tolerable, but to fetter it by the necessities of the lowest and least capable seems a fatal policy." 209 *F.*, at *p.* 121 (emphasis added). As stated by Lockhart and McClure, this language suggests the rejection of the *Hicklin* test in favor of the standards of society as a whole. If, as we believe, the Court in *Roth* intended by the phrase "contemporary community standards" to reject the "mid-Victorian" concept in favor of the "contemporary," and the effect on the weakest in favor of the effect on the average member of society, then the "contemporary community" logically refers to society at large and not some local geographical area.

Lockhart and McClure find further support for their position in the *per curiam* reversal of the United States Court of Appeals decision upholding Chicago's censorship of a movie. *Times Film Corp. v. City of Chicago*, 355 *U. S.* 35, 78 *S. Ct.* 115, 2 *L. Ed. 2d* 72 (1957), reversing 244 *F. 2d* 432 (7 *Cir.* 1957). They assert that the Court would not so summarily have substituted its judgment of Chicago standards for the judgment of the local censors and courts if the Court in fact approved of the application of local standards. Lockhart and McClure, *op. cit. supra*, at *p.* 111.

The Model Penal Code, although it does not expressly discuss community standards, clearly leaves the impression that a national community standard should be applied rather

than a state or local one. See, for example, the Proposed Official Draft 1962, which states in § 251.4:

"(4) *Evidence: Adjudication of Obscenity.*
    In any prosecution under this Section evidence shall be admissible to show:
*   *   *   *   *   *   *   *
    (d) the degree of public acceptance of the material in the United States."

See also Tentative Draft No. 6 (1957) § 207.10(2)(d) and comments thereto.

     We believe that the Legislature in enacting *N. J. S.* 2A:115–2 intended to forbid obscene matter to the fullest extent permissible under the First Amendment, made applicable to the states by the Fourteenth Amendment. Accordingly, the "contemporary community standard" to be applied in enforcement of the statute must comport with the limitations imposed on the State by and the freedoms guaranteed the individual by the First Amendment. We are of the opinion that such a standard must necessarily be uniform throughout the nation.

     The First Amendment accepts for the nation as a whole the basic idea that freedom of expression is a necessary guarantee in a democratic society. In determining the constitutional limits of obscenity regulation, the issue in the particular case is whether the published material falls within or without that area of expression which it is the purpose of the First Amendment to protect. In resolving this issue, the court or jury must recognize that the balancing of freedom of expression against other social values has already been made in the adoption of the First Amendment and that this basic determination cannot be re-evaluated by a *de novo* balancing of local social interests against that area of constitutional protection which has been established. See Emerson, "Toward a General Theory of the First Amendment," 72 *Yale L. J.* 877 (1963). The First Amendment protects an area of free expression which cannot be diminished by obscenity regulation. Therefore, the standard to be applied under

such regulations cannot operate in such a way as to alter the degree of protection from locality to locality. In short, the area of expression entitled to constitutional protection cannot be broad in some parts of the country and narrow in others. If a publication comes within the protected area, it cannot be suppressed any place where the First Amendment guarantee is in effect. If the United States Supreme Court were to hold that a particular publication was entitled to protection under the First Amendment, we doubt that any court, state or federal, could subsequently deny that publication protection on the ground that a higher community standard prevailed in its jurisdiction. See *State v. Hudson County News Co.*, 75 *N. J. Super.* 363, 374 (*Cty. Ct.* 1962).

Accordingly, we hold that the contemporary community standard to be applied under our statute is not the standard of a particular individual, group of individuals, or locality, but it is the standard of the contemporary society of this country at large. The court should so instruct the jury.

In light of the above we conclude that reversible error occurred since the jury were permitted to consider testimony of the local standards in Hudson County and were instructed that they could use those standards in determining whether the magazines in question were obscene. Accordingly, the convictions for the sale of obscene material must be set aside and defendants accorded a new trial.

The judgment of the Appellate Division is reversed. Defendants' convictions under the indictment charging possession with intent to sell are reversed. The convictions under the indictments charging defendants with the sale of obscene publications are vacated and the cause is remanded for retrial of these indictments in accordance with this opinion.

JACOBS, J. (concurring). The definition of obscenity is imprecise and the line it draws between the obscene and nonobscene is obviously thin and obscure—so thin and obscure that many thoughtful students believe that the only workable approach is to confine obscenity to what is known as hard-core

pornography. Although that term itself presents some difficulties, they are much lesser in nature. See Lockhart & McClure, "Censorship of Obscenity: The Developing Constitutional Standards," 45 *Minn. L. Rev.* 5, 58–68 (1960). The Supreme Court's high solicitude for the constitutional freedoms of expression and its actual holdings suggest that only that type of material is likely to be found obscene within the limits contemplated by *Roth v. United States,* 354 *U. S.* 476, 77 *S. Ct.* 1304, 1 *L. Ed.* 2d 1498 (1957). See *Times Film Corp. v. City of Chicago,* 355 *U. S.* 35, 78 *S. Ct.* 115, 2 *L. Ed.* 2d 72 (1957); *Mounce v. United States,* 355 *U. S.* 180, 78 *S. Ct.* 267, 2 *L. Ed.* 2d 187 (1957); *Sunshine Book Co. v. Summerfield,* 355 *U. S.* 372, 78 *S. Ct.* 365, 2 *L. Ed.* 2d 352 (1958); *One, Inc. v. Olesen,* 355 *U. S.* 371, 78 *S. Ct.* 364, 2 *L. Ed.* 2d 352 (1958); *Lockhart & McClure, supra,* at *pp.* 13 *et seq.;* Emerson, "Toward a General Theory of the First Amendment," 72 *Yale L. J.* 877, 937–939 (1963). Persuasive opinions by the courts of New York, Massachusetts and California and by Judge Matthews in the Essex County Court embody support for that view. See *People v. Richmond County News, Inc.,* 9 *N. Y.* 2d 578, 216 *N. Y. S.* 2d 369, 175 *N. E.* 2d 681 (1961); *Attorney General v. Book Named "Tropic of Cancer,"* 354 *Mass.* 11, 184 *N. E.* 2d 328 (1962); *Zeitlin v. Arnebergh,* 59 *Cal.* 2d 901, 31 *Cal. Rptr.* 800, 383 *P.* 2d 152 (1963); *State v. Hudson County News Co.,* 75 *N. J. Super.* 363 (*Essex Cty. Ct.* 1962). It seems to me that their approach affords the greater hope for truly satisfying the State's primary interest in the protection of democratic freedoms along with its secondary interest in curbing obscene literature; and in any event it would reduce the danger of having basic rights trampled upon, as occurred here.

Regardless of what approach is taken, reversal of the convictions is clearly called for; not only because of the legal errors dealt with in the majority opinion, but also for many other errors, which though not raised by the appellants, permeated the entire proceeding below. Thus in their first step police officers engaged in objectionable censorship. Illustra-

tive is the action by one of the police captains who removed seven magazines from a rack because he felt that they were not the "right type for people to purchase." He made no arrest and filed no complaint but told the dealer "not to put any more of these magazines up for sale." When the jury returned its verdict almost three years later it found most of the magazines which the captain had taken to be not obscene; but as a result of his activities they had undoubtedly been long and improperly precluded from the market. See *Bantam Books v. Sullivan,* 372 *U. S.* 58, 83 *S. Ct.* 631, 637, 9 *L. Ed. 2d* 584, 591 (1963); *cf. Bantam Books, Inc. v. Melko,* 25 *N. J. Super.* 292 (*Ch. Div.* 1953), modified 14 *N. J.* 524 (1954).

When the officers entered the defendants' premises (*cf. Commonwealth v. Jacobs,* —— *Mass.* ——, 191 *N. E. 2d* 873 (1963); *Commonwealth v. Dorius,* —— *Mass.* ——, 191 *N. E. 2d* 781 (1963)) they found thousands of magazines and other publications. They spent two and one-half hours looking for items which would meet their concept of obscenity; one of them defined obscenity to be that which was below his "moral standards" and below the moral standards of the people he knew in the community. They confiscated the available copies of seven magazines (one hundred of each) but years later the jury found all but one of these to be not obscene. Here again the non-obscene material had been long and improperly precluded from the market. See *Bantam Books v. Sullivan, supra; Marcus v. Property Search Warrant,* 367 *U. S.* 717, 81 *S. Ct.* 1708, 6 *L. Ed. 2d* 1127 (1961).

During the trial the State presented a psychiatrist who was permitted to express her views as to obscenity and the community standards of Hudson County.[1] An objection to the

---

[1] Though she had training as a psychiatrist, her qualification to testify as to community standards may be doubted (*compare Womack v. United States,* 111 *U. S. App. D. C.* 8, 294 *F. 2d* 204, 206, *cert.* denied, 365 *U. S.* 859, 81 *S. Ct.* 826, 5 *L. Ed. 2d* 822 (1961) *with Yudkin v. State,* 229 *Md.* 223, 182 *A. 2d* 798, 802 (1962)), and in no event should she have been permitted, as she was, to roam about freely through the field of obscenity.

use of local community standards was overruled and, as the majority now holds, that was clearly erroneous. Also objectionable was the test of obscenity upon which the testimony of the State's witness was apparently grounded. She seemed to take the position that portrayal of any sex abnormality or perversion was necessarily obscene; and she seemed to view any use of sex other than for propagation of the race as abnormal or perverted. *Cf. Roth v. United States, supra,* 354 *U. S.,* at *p.* 487, 77 *S. Ct.,* at *p.* 1310, 1 *L. Ed. 2d,* at *p.* 1508. Thus at one point she testified that if sex is used for excitement and as an end by itself, then she would say it becomes obscene. And at another point she testified as follows: "When sex isn't just for the propagation of the race and of the species, I would say, or the intent isn't, then it is abnormal or perverted." On cross-examination the defendants sought to refer to a statement by a well-recognized psychiatrist who differed with her views on a certain point, but they were prevented from doing so by a ruling of the court; that ruling was erroneous. See *Ruth v. Fenchel,* 21 *N. J.* 171 (1956). Ultimately the trial judge instructed the members of the jury that they could consider and give weight to her testimony in deciding the submitted questions of obscenity and community standards.

During the trial the State tendered several witnesses as "average men" of Hudson County. Above objection, they were permitted to testify. Reference need here be made to the testimony of only the first of them. He was the general manager of a printing company who believed that he knew what the "average person" in Hudson County likes and feels; he considered that Hudson County has a "very, very high moral standard as compared with other areas" that he had visited; he expressed the view that "the word obscene as connected with these magazines is anything that would bring harm spiritually or in any way to a member of the community"; and he concluded that the magazines were not acceptable as to "moral standards" or the "standards of the community of Hudson County." In response to an inquiry as to when sex

and its portrayal become obscene, he indicated that in his opinion that would occur when unrelated to the "marital chamber * * * where God meant it to be" and to "propagation of the race as I was taught." His private beliefs and moralities clearly had no pertinency to any of the issues in the proceeding. *Cf. Roth v. United States, supra; Manual Enterprises v. Day,* 370 *U. S.* 478, 82 *S. Ct.* 1432, 8 *L. Ed. 2d* 639 (1962).

Obviously the State should not have tendered any of the so-called average men and their testimony should have been excluded as incompetent. No man can qualify as the average man for there is no such being except in a hypothetical sense. In his charge the trial judge set the members of the jury adrift by telling them that they were free to give such weight and credit to the community standards testimony as they thought it was "entitled to under the law." And nowhere in the charge was there any effort to remove the effects of the grossly erroneous definitions of obscenity which had confused the proceeding. Indeed the confusion was confounded when the trial judge told the jury that most persons have a conception as to the meaning of obscenity "and you may use it in your everyday life" and by his reference to a dictionary definition of obscenity which included broadly descriptive words such as "foul," "disgusting," "offensive to chastity or to modesty." Admittedly these did not satisfy the law. See *Roth v. United States, supra; Manual Enterprises v. Day, supra.*

The people of our country value their freedoms most highly. They fear censorship activities and expect that proceedings by the State will strictly adhere to their traditional concepts of fair play and fair trial. Here these concepts were departed from and the resulting convictions may not be permitted to stand. See *State v. Orecchio,* 16 *N. J.* 125, 129 (1954). I vote to reverse.

JACOBS, J., concurs in result.

*For reversal*—Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*For affirmance*—None.

