86 N.J. Super. 82 (1964)
205 A.2d 913
G.P. PUTNAM'S SONS, A CORPORATION, PLAINTIFF,
v.
GUY W. CALISSI, BERGEN COUNTY PROSECUTOR, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided December 7, 1964.
*84 Messrs. Parisi, Evers & Greenfield (Mr. Irving C. Evers, appearing) and Messrs. Rembar & Zolotar (Mr. Charles Rembar, of the New York Bar, appearing), attorneys for plaintiff.
*85 Mr. Guy W. Calissi, Bergen County Prosecutor (Mr. Ronald J. Picinich, Assistant Prosecutor, appearing), attorney for defendant.
PASHMAN, J.S.C.
The controversy presently before the court involves an application by the Prosecutor of Bergen County for injunctive relief against G.P. Putnam's Sons, the publisher and distributor of John Cleland's Memoirs of a Woman of Pleasure, more commonly known as Fanny Hill. Although the case was initiated by the publisher, who sought certain injunctive relief against the prosecutor, both parties have agreed that this court should treat the prosecutor as the moving party.
The statutory basis for the relief sought by the prosecutor is found in N.J.S. 2A:115-3.5, which provides, in part, that:
"The county prosecutor * * * in any county * * * in which a * * * corporation sells or distributes or is about to sell or distribute * * * any book, * * * or any written or printed matter of an indecent character, which is obscene, lewd, lascivious, filthy or indecent or which contains an article or instrument of indecent or immoral use or purports to be for indecent or immoral use or purpose, may maintain an action for a judgment granting relief in the nature of injunctive relief against such * * * corporation in the Superior Court to prevent the sale * * * or the distribution * * * of any book * * * of an indecent character, herein described."
The publisher has conceded that the legislatively prescribed procedure found in N.J.S. 2A:115-3.5, does not, in itself, violate any of its constitutionally guaranteed rights. Cf. Kingsley Books, Inc. v. Brown, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957). It is argued, however (quite correctly), that the substantive application of this statute must accord with the federal constitutional standards enunciated by the Supreme Court of the United States in the free speech-obscenity area. See, e.g. Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Manual Enterprises v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962); and Jacobellis v. State of Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).
*86 The highest judicial tribunal of this nation has observed that the line separating obscenity from constitutionally protected expression is "dim and uncertain." See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). However, as Justice Proctor, speaking for our Supreme Court, observed in State v. Hudson County News Co., 41 N.J. 247 (1963):
"* * * the guidelines established initially in Roth and clarified in Manual Enterprises v. Day * * * are the best determinants available to a court in reaching its decision whether particular material is obscene by constitutional standards." (at p. 255)
Defendant in Roth v. United States, supra, was charged with having violated federal and state obscenity statutes. Mr. Justice Brennan, speaking for the majority of the court, repeatedly emphasized the broad protective scope of the First Amendment, stating in one passage that
"All ideas having even the slightest redeeming social importance  unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion  have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance." (354 U.S., at page 484, 77 S.Ct., at page 1309)
In formulating a workable test of obscenity, the majority in Roth held that a court should inquire "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." 354 U.S., at page 489, 77 S.Ct., at page 1311. Finally, the court observed in a footnote that there is no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I. Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), viz.:
"* * *. A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in *87 nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or misrepresentation of such matters. * * *" 354 U.S., at page 486, 77 S.Ct., at page 1310, Note 20
Several years after Roth was decided, the Supreme Court in Manual Enterprises v. Day, supra, held that the conclusion that literature is obscene and therefore not entitled to the protective cloak of the First Amendment requires a finding that the challenged material is patently offensive as well as having its predominant appeal to prurient interest. In the words of the Court:
"* * * `Material is obscene if, considered as a whole, its predominant appeal is to prurient interest * * * and if in addition it goes substantially beyond customary limits of candor in describing or representing such matters.' * * *
Obscenity under the federal statute thus requires proof of two distinct elements: (1) patent offensiveness; and (2) `prurient interest' appeal. Both must conjoin before challenged material can be found `obscene' * * *. In most obscenity cases, to be sure, the two elements tend to coalesce, for that which is patently offensive will also usually carry the requisite `prurient interest' appeal. * * *" 370 U.S., at page 486, 82 S.Ct., at page 1436.
In the latest case dealing in what has been appropriately termed a "grey area," cf. State v. Hudson County News Co., supra, 41 N.J., at page 254, Mr. Justice Brennan, speaking for the court, stated that
"The question of the proper standard for making [a determination as to whether certain material is constitutionally protected] has been the subject of much discussion and controversy since our decision in Roth-Alberts seven years ago. Recognizing that the test for obscenity enunciated there  `whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest,' * * * is not perfect, we think any substitute would raise equally difficult problems, and we therefore adhere to that standard. We would reiterate, however, our recognition in Roth that obscenity is excluded from the constitutional protection only because it is `utterly without redeeming social importance,' and that `[t]he portrayal of sex, e.g., in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press.' * * * It follows that material dealing with sex in a manner that advocates ideas, * * * or that has literary or scientific or artistic value or any *88 other form of social importance, may not be branded as obscenity and denied the constitutional protection. Nor may the constitutional status of the material be made to turn on a `weighing' of its social importance against is prurient appeal, for a work cannot be proscribed unless it is `utterly' without social importance. * * * It should also be recognized that the Roth standard requires in the first instance a finding that the material `goes substantially beyond customary limits of candor in description or representation of such matters.' * * * In the absence of such a deviation from society's standards of decency, we do not see how any official inquiry into the allegedly prurient appeal of a work of expression can be squared with the guarantees of the First and Fourteenth Amendments. [citing Manual Enterprises, supra]." Jacobellis v. State of Ohio, 378 U.S., 184, at p. 191, 84 S.Ct. 1676, at p. 1680, 12 L.Ed.2d 793, at p. 799 (1964).
The court in Jacobellis also held that the phrase "contemporary community standards" contemplates a national standard of decency and not a local one. See also State v. Hudson News Co., supra, 41 N.J., at pages 263-264. In rejecting the reading of Roth which tested obscenity by the standards of the particular local community in which a case is instituted, Justice Brennan referred to the opinion of Judge Learned Hand in United States v. Kennerley, 209 F. 119, 121 (D.C.S.D.N.Y. 1913), concluding that
"It seems clear that * * * Judge Hand was referring not to state and local `communities,' but rather to `the community' in the sense of `society at large; * * * the public, or people in general.' Thus, he recognized that under his standard the concept of obscenity would have `a varying meaning from time to time'  not from county to county, or town to town.
"We do not see how any `local' definition of the `community' could properly be employed in delineating the area of expression that is protected by the Federal Constitution. MR. JUSTICE HARLAN pointed out in Manual Enterprises, Inc. v. Day, * * * that a standard based on a particular local community would have `the intolerable consequence of denying some sections of the country access to material, there deemed acceptable, which in others might be considered offensive to prevailing community standards of decency. * * *'

* * * * * * * *
"* * * The Court has explicitly refused to tolerate a result whereby `the constitutional limits of free expression in the Nation would vary with state lines,' * * * we see even less justification for allowing such limits to vary with town or county lines. We thus reaffirm the position taken in Roth to the effect that the constitutional status of an allegedly obscene work must be determined on the basis of a *89 national standard." 378 U.S., at pages 193, 194, 84 S.Ct., at pages 1681 and 1682, 12 L.Ed.2d, at pages 801, 802.
The book which is the subject matter of the instant case has been reviewed, under different factual circumstances, by the courts of other states. In Nugent v. A Book Entitled "Fanny Hill," etc., R.I. (1964), the Attorney General of Rhode Island instituted an in rem proceeding seeking injunctive relief based upon his position that there was "reasonable cause to believe that the book was obscene." The court was not faced with the ultimate issue, now before this court, of whether the book is obscene in fact, but in finding that "reasonable cause" did exist the Superior Court of Rhode Island observed that:
"The book is weighted down with acts of sexual intercourse  scarcely a page goes by without some reference to it in preparation or in action. In the presentation of the acts of intercourse the descriptions of the actions involved and of the emotional and sensory experiences of the participants are in the greatest possible detail. These descriptions are not biological instruction, nor to enlighten the mind regarding the emotions and passions.
The author has not only presented the normal sexual act between male and female in the most intimate manner each time, but he has ranged the whole gamut of sexual aberration, masochism and sadism, lesbianism and male homosexuality, and other sexual abnormalities in a similar fashion.
Considered as a whole the dominant theme of the book is an appeal to prurient interest. In the constant renewal of the intimate terms of the sexual act and in the portrayal of sex deviations we are given a patently offensive portrayal which goes substantially beyond customary limits of candor in describing or representing such matters."
Another state court opinion dealing with Fanny Hill was decided by the Court of Appeals in the State of New York. See Larkin v. G.P. Putnam's Sons, 14 N.Y.2d 399, 252 N.Y.S.2d 71, 200 N.E.2d 760 (Ct. App. 1964). The issue in that case, identical to the one in the case sub judice, was whether certain law enforcement officials were entitled to an injunction restraining the publisher from selling and distributing "the book." In reversing the Appellate Division, 20 *90 A.D.2d 702, 247 N.Y.S.2d 275, which had itself reversed the trial court's determination that the book was not obscene, the highest court of the State of New York stated that "definitions are unsafe vehicles in obscenity cases," 14 N.Y.2d, at page 399, 252 N.Y.S.2d, at page 73, 200 N.E.2d, at page 761, and held that
"When one looks carefully at the record since 1956 of what on constitutional grounds has been allowed to be printed and circulated, and what has been suppressed, `Fanny Hill' seems to fall within the area of permissible publications. It is an erotic book, concerned principally with sexual experiences, largely normal, but some abnormal.
It has a slight literary value and affords some insight into the life and manners of mid-18th century London. It is unlikely `Fanny Hill' can have any adverse effect on the sophisticated values of our century. Some critics, writers, and teachers of stature testified at the trial that the book has merit, and the testimony as a whole showed reasonable differences of opinion as to its value. It does not warrant suppression." 14 N.Y.2d 399, 252 N.Y.S.2d, at page 74, 200 N.E.2d, at page 762.
Based upon the decision of the Supreme Court of the United States with respect to the book Pleasure Was My Business, Tralins v. Gerstein, 378 U.S. 576, 84 S.Ct. 1903, 12 L.Ed.2d 1033 (1964) which the Court of Appeals regarded "as being in a class with `Fanny Hill' and perhaps as going somewhat farther in utilization of objectionable material," the New York court decided that:
"[i]f that work [Pleasure Was My Business] could not be restrained by Florida because of interdiction of the Constitution, New York would quite obviously be left without authority to restrain `Fanny Hill.'" 14 N.Y.2d 399, 252 N.Y.S.2d, at page 75, 200 N.E.2d, at page 763.
Chief Justice Desmond and Justices Marks and Scileppi filed vigorous dissents. The vote was 4-3.
In the most recent case concerning Fanny Hill, Brooke v. "Fanny Hill," Mass. (Sup. Jud. Ct. 1964), the Attorney General of Massachusetts instituted a proceeding to adjudicate "Fanny Hill" obscene under the General Laws of the *91 State. The court was faced with the same issue now before this court. The book was found to be obscene in the trial court.
At the trial of this cause, both sides introduced expert testimony which was designed to aid this court in resolving the difficult constitutional issues presented. The testimony offered by the prosecutor attempted to prove that (1) the dominant theme of the book is abnormal sex; (2) the effect of reading this book is that a "normal person" might be stimulated to perform abnormal sexual acts; (3) the book is the product of a psychopathic author, and (4) the book exceeds customary limits of candor and is contrary to generally accepted standards of morality. The publisher, on the other hand, utilized the services of literary experts and professors of literature, including Fred Holley Stocking, Professor of English and Chairman of the English Department at Williams College; John Owen McCormick, Professor of Comparative Literature and Chairman of the Department of Comparative Literature at Rutgers University; Max Levin, a highly qualified neurologist and psychiatrist, who is a clinical professor of neurology at the New York Medical College and the Psychiatric editor of Current Medical Digest; J. Donald Adams, editor of the Sunday Book Review Section of The New York Times; Dr. Clarence Decker, vice-president of Fairleigh Dickenson University and Professor of World Literature; Wardell B. Pomeroy, Director of Field Research for the Institute for Sex Research at Indiana University; Elliott Freemont-Smith, editor of The New York Times Book Review Section; Paul Fussell, Jr., Associate Professor of English and Director of English graduate studies at Rutgers University; Walter J. Minton, president of G.P. Putnam's Sons; and David Burrows, Assistant Professor of English at Douglass College.
The conclusions reached by this imposing list of experts may be summarized as follows: (1) the book has a definite literary purpose, reflected by the development of the central character and dramatized by the ceremonious, formal, elegant, *92 witty and comic prose style employed by the author; (2) the book provides a valuable insight into a way of life; (3) the book has historical value with respect to the development of the English novel and affords the reader an opportunity to learn about 18th Century English society, and (4) the book, while it is a classic in pornography and may accurately be termed an "erotic novel," is not as objectionable as other contemporary works of literature or the coverage given by the newspapers to the "Profumo scandal" in England.
This court feels that the testimony of the literary experts and qualified scholars offered by the publisher with respect to the literary merit, historical significance and other qualities which constitute "social value" is not only appropriate from the standpoint of competency, but that such testimony is entitled to great weight. Cf. Larkin v. G.P. Putnam's Sons, supra; Grove Press, Inc. v. Christenberry, 175 F. Supp. 488, (D.C.S.D.N.Y. (1959)) affirmed 276 F.2d 433 (2 Cir. 1960); and Attorney General v. Book Named "Tropic of Cancer," 345 Mass. 11, 184 N.E.2d 328 (Sup. Jud. Ct. 1962). This is not to say, however, that the conclusions reached by these experts are dispositive of the ultimate substantive issue before the court. Indeed, this court retains the obligation of deciding, upon all the evidence presented, whether the book in question has that degree of social value which calls into play the guarantees of the First Amendment.
The court also believes that expert testimony is appropriate in the area of "contemporary community standards" and the "customary limits of candor." On the other hand, the question of whether or not the book has a predominant appeal to prurient interest remains, in my opinion, a legal conclusion which is not properly the subject of factual or documentary evidence.
While certain expert opinion is admissible and may properly serve as an aid to the resolution of the substantive issues presented, there is a danger inherent in blindly accepting the conclusion of "the expert" in this area of law. As the New York Court of Appeals observed in People v. Fritch, 13, *93 N.Y.2d 119, 243 N.Y.S.2d 1, 192 N.E.2d 713 (Ct. App. 1963):
"It does not follow * * * that because an alleged work of literature does not appeal to the prurient interest of a small group of intellectuals that it is not obscene under the prurient interest, or for that matter any other legal test of obscenity. This would permit the substitution of the opinions of authors and critics for those of the average person in the contemporary community. The fact that a few literary figures have commented favorably on this book and have lent it their prestige does not expunge from its pages the flagrantly obscene and patently offensive matter which dominates the book as a whole. * * *
A book may not be judged by its cover, its introduction or the laudatory comments contained in the publisher's blurbs  rather it must be judged by its actual contents. It requires little perception or imagination to conceive that the actual contents of a book may completely negate these testimonials and indorsements. Nor does the fact that the author enjoys wide acclaim as a writer control, for the book must be judged, not by the reputation of the author, but by what he writes in it. To hold otherwise would give recognized writers the freedom to traffic in obscenity at will under the guise of creating a work of art. This court will not adopt a rule of law which states that obscenity is suppressible but that well-written obscenity is not." 243 N.Y.S.2d, at page 7, 192 N.E.2d, at page 717.
A review of the applicable Supreme Court decisions indicates that the book Fanny Hill must be judged by itself. The fact that Tropic of Cancer or Pleasure Was My Business has received the judicial stamp of approval is not determinative of the constitutional status of Fanny Hill. Because no two books are alike, each court must evaluate the book before it on its actual contents and not by comparing it to some other book. The test is not whether a particular book is as objectionable or less objectionable than another literary work which has been sustained by a higher court. The test is whether the book predominately appeals to "prurient interest" and, in addition, is "patently offensive." See Jacobellis v. State of Ohio, supra. Strong opposition from the Chief Justice and one other member of the United States Supreme Court failed to rally a majority in Jacobellis. The court held that in situations such as the matter sub judice, the ultimate decision must be case by case.
*94 There is no doubt, and the publisher concedes, that the book Fanny Hill is an erotic novel which is preoccupied with normal and abnormal sexual experiences. This preoccupation is not, however, a sufficient reason to restrain the distribution of the book. Sex and obscenity are not synonymous. Nor are they interchangeable terms. It is only when the book, as a whole, deals with sex in a manner which is patently offensive, utterly without redeeming social importance, and appeals to prurient interests that a court is justified in granting injunctive relief. See Roth, Manual Enterprises and Jacobellis, supra.
Subjective distaste for the contents of a book is also not a proper basis for a finding of obscenity. The court must act within the well-defined boundaries established by the applicable decisions of the Supreme Court, and in so doing the court is not acting as a censor but is instead discharging its constitutionally assigned role. As Mr. Justice Brennan appropriately observed in Jacobellis v. State of Ohio, supra:
"Nor can we understand why the Court's performance of its constitutional and judicial function in this sort of case should be denigrated by such epithets as `censor' or `super-censor.' In judging alleged obscenity the Court is no more `censoring' expression than it has in other cases `censored' criticism of judges and public officials, advocacy of governmental overthrow, or speech alleged to constitute a breach of the peace. Use of an opprobrious label can neither obscure nor impugn the Court's performance of its obligation to test challenged judgments against the guarantees of the First and Fourteenth Amendments and, in doing so, to delineate the scope of constitutionally protected speech." 378 U.S., at p. 190, 84 S.Ct., at p. 1679, 12 L.Ed.2d, at p. 799.
I feel that it is wrong to pay lip service to the standards enunciated by the highest court of this land and then conclude that a book is not obscene because it is not as objectionable as some other book. See Larkin v. G.P. Putnam's Sons, supra.
Furthermore, it is wrong to argue that because a book may be morally bad for children, it is therefore bad for the average normal adult. There is no question that each state has a legitimate interest in "preventing the dissemination *95 of material deemed harmful to children. But that interest does not justify a total suppression of such material, the effect of which would be to `reduce the adult population * * * to reading only what is fit for children.' * * *" Jacobellis v. Ohio, supra, 378 U.S., at p. 195, 84 S.Ct., at p. 1682, 12 L.Ed.2d, at p. 802. See also City of Newark v. Licht, 83 N.J. Super. 499, 503 (App. Div. 1964), and Mr. Justice Frankfurter's comment in Butler v. Michigan, 352 U.S., at p. 383, 77 S.Ct., at p. 524, 1 L.Ed.2d, at p. 412 (1957).
I have read and reread Fanny Hill seeking to be as objective as possible. It was first published in 1749 and has been in surreptitious circulation ever since. Chief Justice Desmond, in his dissenting opinion in Larkin, noted that for centuries, "`Fanny Hill' has been cited throughout the world as the very prototype and Archetype of obscenity, `the pornographic best seller of all time' (Loth, The Erotic in Literature, 1961, p. [31] 32) * * *." It requires ten pages to bring our "heroine," Fanny, to the bawdy house, and the remaining 260 pages to depict to the last intimate detail varied sexual adventures described as voyeurism, transvestitism, prostitution, homosexuality, heterosexuality, lesbianism, female masturbation, seduction of a virgin male, the deflowering of a virgin, the flagellation of male by female and female by male, and other kinds of sexual debauchery, including unnatural acts and exhibitions of sexual excesses. It is difficult to perceive any omissions on the part of the author. One sexual act follows another. What purpose can there be but to sexually arouse the reader? Those who contend that Fanny Hill is a work of literary value because it affords insight into the life and manners of mid-18th Century London must necessarily have an overwhelming sense of humor. Resort to Fanny Hill to study or authenticate the mores of those times would be the nadir of research.
It is my opinion that the dominant theme of the book, as a whole, deals with sex in a manner appealing to prurient interests. The repeated and continuous efforts of the author to treat each act of sex in a minutely detailed manner represents *96 "a shameful and morbid interest in sex" which "goes substantially beyond customary limits of candor." Roth v. U.S., supra.
It is inconceivable to this court, that "the average person" could read Fanny Hill and receive the slightest social, literary or historical value from it. The fact that a selected group of literary experts do find such values does not, in my opinion, mean that the "average person" would, should or could find the same. In short, the book is utterly without redeeming social value.
This court also finds that the book is "patently offensive." See Manual Enterprises, Inc. v. Day, supra. While I do not subscribe to the balancing of interests concept advocated by Judge Scileppi in his disenting opinion in Larkin v. G.P. Putnam's Sons, 14 N.Y.2d, at page 399, 252 N.Y.S.2d, at page 78, 200 N.E.2d, at page 765, I feel that his observations with respect to the nature of the book, merit repeating:
"[Fanny Hill] is one of the foulest, sexually immoral, debasing, lewd and obscene books ever published, either in this country or abroad. It was written in the middle of the 18th Century and for many years was barred as an obscene book in Europe as well as in this country.
`Fanny Hill' reeks with disgusting descriptions of natural and unnatural sexual experiences of a prostitute, so dealt with as to portray those baser instincts normally to be found in the animal kingdom. In my view, it is obscene by any of the established legal standards.

* * * * * * * *
The majority opinion * * * sounds the death knell of the long honored standards of American decency which have remained an integral part of our national heritage. I cannot agree that our society, even in 1964, has become so depraved that it has come to accept the kind of trash represented by `Fanny Hill' and similar books, the publishers and purveyors of which are now given unbridled permission to advertise obscenity for sale with complete immunity." 252 N.Y.S.2d, at page 78, 200 N.E.2d, at page 765.
See also the dissenting opinion of Chief Judge Desmond in Larkin v. G.P. Putnam's Sons, 252 N.Y.S.2d, at pages 76 to 78, 200 N.E.2d, at pages 763 to 765.
*97 Assuming that I agreed with the publisher's experts that the book has elegance, style, wit and charm (much of which I feel is lacking), such conclusions cannot, in my opinion, alter my determination that the book is obscene. A book may be well-written but still obscene.
"Filth, even if wrapped in the finest packaging, is still filth. `Charm of language, subtlety of thought, faultless style, even distinction of authorship, may all * * * be present and the book be unfit for dissemination to the reading public. Frequently these attractive literary qualities are the very vehicles by which the destination of illegality is reached.' * * * `This court will not adopt a rule of law which states that obscenity is suppressible but well-written obscenity is not.'" People v. The Bookcase, Inc. 40 Misc, 2d 796, 244 N.Y.S.2d 297, 300 (Crim. Ct. of City of N.Y. 1963)
Applying the "social value" test, the "prurient interest" test, the "patently offensive" test and even the "hard core pornography" test (not approved by the United States Supreme Court), this publication fails to measure up to the requisite standard entitling it to the protection of the First Amendment.
Almost every citizen applauds the awesome role assumed by the United States Supreme Court as protector of the constitutional guarantees of free speech. Who would not risk his life to defend these hard-won freedoms? Exciting progress has been made. Few knowledgeable people would tolerate the slightest trespass upon these rights, but obscenity "is not to be admitted to the constitutional sanctuary." We must heed the germane judicial concepts and conform faithfully to the creed of those whose responsibility is to guide. Said Mr. Justice Frankfurter:
"* * * The task is onerous and exacting, demanding as it does the utmost discipline in objectivity [and], the severest control of personal predilections" * * * Kingsley International Pictures Corp. v. Regents of University of State of New York, 360 U.S. 684, 697, 79 S.Ct. 1362, 1370, 3 L.Ed.2d 1512 (1959).
The widespread circulation of books and pictures (both movies and stills) of dubious cultural value in our present-day *98 society causes one to hesitate before enjoining any single work. But the plethora of filth in our society is a poor excuse for affording constitutional protection to Fanny Hill. Condonation of this class of erotic literature will contribute nothing to the elevation of our moral standards. Even a magistrate in the "home" country of Fanny Hill recently ruled the book obscene. And now "Fanny Hill Comes Alive!" The "best" parts of the book are now available in a long-playing record album with all the lusty and intimate scenes of this erotic work realistically recited by four "stars." In fact, it is advertised as having been banned for 200 years and now available.
There are proponents of a trend that would unhold a work although "trashy" and "disgusting," because there are no "four-letter" words and because "in all their erotic descriptions they maintain a clever, and apparently deliberate, avoidance of socially unacceptable language." But this position does not recognize the appropriate tests established by the United States Supreme Court. I cannot accept the baseless conclusion of these purveyors that there must be a place in our society for such writings because of compliance with the afore-mentioned trend. It is our duty to prevent the circulation of such pornographic literature as the United States Supreme Court has held is not within the protection of the First Amendment. It is as much our duty to protect publications entitled to the guarantees of the same amendment where authorities seek to suppress. Our personal predilections are unimportant. We should be guided by the cases afore-mentioned as well as Sunshine Book Company v. Summerfield, 355 U.S. 372, 78 S.Ct. 365, 2 L.Ed.2d 352 (1958); Kingsley International Pictures Corp. v. Regents of University of State of New York, 360 U.S. 684, 79 S.Ct. 1362, 3 L.Ed.2d 1512 (1959); A Quantity of Copies of Books v. State of Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809, and Gross Press, Inc. v. Gerstein, 378 U.S. 577, 84 S.Ct. 1909, 12 L.Ed.2d 1035.
*99 Free rein should not be given under the guise of constitutional guarantees to vilely depict perversions and sexual adventures as John Cleland saw fit 200 years ago. This is not the highway to a better constitutional world; it is rather the path to decay and decline. The Constitution should not be the sword of a shameful profiteer of filth. It must be the shield to protect our sense of moral decency.
Based upon the foregoing, it is the opinion of this court that the book Fanny Hill is sufficiently obscene to forfeit the protection of the First Amendment to the Constitution. The prosecutor is therefore entitled to injunctive relief enjoining and restraining the publisher from publishing, selling or distributing the book in the State of New Jersey. The parties should present a form of judgment in accordance with this opinion.