122 N.J. Super. 409 (1973)
300 A.2d 595
THE STATE OF NEW JERSEY, PLAINTIFF,
v.
EDWARD SHAPIRO AND MILTON NERENBERG, DEFENDANTS.
Superior Court of New Jersey, Law Division (Criminal).
Decided January 26, 1973.
*415 Mr. Robert F. Levy, attorney for defendants.
Mr. Steven C. Rubin, Assistant Prosecutor for the State (Mr. James M. Coleman, Jr., Prosecutor of Monmouth County, attorney; Paul D. Moroney, Asst. Prosecutor, on the brief).
Mr. Richard B. McGlynn, Deputy Attorney General, for the State (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
McGANN, Jr., J.S.C.
Prior to August 25, 1972 defendants had been in the business of selling books and magazines at the "Action Auction" on Highway 36 in Middletown township. On August 25, 1972 and again on September 1, 1972 police officers of the township, without benefit of a warrant, entered defendants' premises and seized various publications. *416 These publications are listed in schedules A through D[*] and encompass 270 different items. Copies of some of the items were also seized.
Pursuant to R. 3:5-7 timely motions were made to suppress the use of such items as evidence in any pending criminal prosecution, as well as for return of the property seized. Pending the disposition of the motion all of the items seized were turned over to the Monmouth County Prosecutor's Office. Between the date of the motion and the hearing I reviewed each of them.

I
If a warrant is couched in general terms directing a police officer to search for and seize property "used as a means of committing a misdemeanor in violation of the laws of the State of New Jersey, to wit: 2A:115-2, uttering, exposing or selling obscene literature or pictures," it violates Fourth Amendment rights as applied to First Amendment freedoms. State v. Muldowney, 60 N.J. 594 (1972). The prosecutor conceded the legal conclusion of the a fortiori argument in this case where the police had no warrant whatsoever. The order of suppression was entered on October 3, 1972.

II
The Prosecutor resists, however, the return of the publications. He argues that they are obscene; that their being possessed by defendants with intent to sell violates N.J.S.A. 2A:115-2; that the items are therefore contraband and not subject to return. N.J.S.A. 2A:115-2 provides in pertinent part as follows:
*417 Any person who, without just cause, utters or exposes to the view * * * of another, or possesses with intent to utter or expose to the view * * * of another, any obscene or indecent book, publication, pamphlet, picture * * * or other representation however made or any person who shall sell * * * or distribute or possess with intent to sell * * * distribute, or offer for sale any obscene or indecent book, publication, pamphlet, picture or other representation, however made * * * is guilty of a misdemeanor.
There is no doubt but that defendants were in the business of selling the seized publications. If the materials are obscene or indecent, defendants were prima facie violating the criminal law.[1] That the actions of the police effectively frustrated any prosecution for the crime does not detract from the criminal activity engaged in by defendants. If the materials are obscene or indecent, they are contraband.
In this action the State is not seeking a forfeiture; it is resisting defendants' motion that the materials be returned. Strictly speaking, forfeiture principles do not apply. State v. Sherry, 46 N.J. 172 (1965). If the materials are obscene, the activity engaged in by defendants was a crime. As a matter of public policy the materials should not be returned to be used in future illegal activity, any more easily than would an unauthorized weapon whose evidential use had been suppressed. If the materials are obscene, defendants can claim no property right in them by virtue of purchase from a distributor, any more successfully than could a pawnbroker who purchased a stolen item for adequate value.

III
Insofar as a determination of obscenity vel non is concerned, defendants raise a number of threshold arguments.

*418 A
They urge, initially, that before this court can make any determination it must hold an "adversary hearing."
In obscenity cases, in order that First Amendment rights be safeguarded, an adversary (as contrasted with an ex parte) hearing is required before a wholesale seizure. A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964). An adversary hearing in this sense consists in "the opportunity for adversary presentation to ensure that expression will not be suppressed without contest and justification." Cambist Films, Inc. v. Illinois, 292 F. Supp. 185 (U.S.D.C. 1968).
The term "adversary hearing" is meaningless as applied to this case where the seizure has already been declared illegal. What is before the court is the question of return of the materials. That issue has been fully argued. Defense counsel has submitted lengthy and detailed memoranda and supplements thereto. Oral argument was had in which the positions of the parties were fully explored. If an "adversary hearing" is required, one was had.
It must be remembered that this case is not that of a wholesale seizure which would effectively deprive the citizens of a large area of the opportunity to buy and read the publications  as was A Quantity of Books, supra. If the people of Monmouth County feel a need to read the titles listed in the schedules, I have no doubt but that they can find other sources readily available. The instant action arises not because a prosecutor is on a county-wide sweep to prevent the free expression of ideas but rather because a local police department, in a procedurally incorrect way, is seeking to enforce the criminal law.

B
Defendants argue additionally that to find justification to deny the motion for return of the books, i.e., in order to determine them obscene, this court must apply not *419 only the correct constitutional tests but also must have the benefit of expert testimony. No authority is cited making that a mandatory requirement. There may be cases in which expert opinion could well be helpful to the factfinder. Cf. Keuper v. Wilson, 111 N.J. Super. 489, 495 (Ch. Div. 1970). This is not such a case. I have perused the publications  all 270 of them. I can read English; I can see the photographs. I am able to comprehend each work as a whole. After determining as a matter of law what constitutional standards should apply, I no more need "expert" opinion to make the ultimate finding than I would in applying the standard of the reasonably prudent man in a negligence action. Evidence Rule 56 (2); Angel v. Rand Express Lines, Inc., 66 N.J. Super. 77 (App. Div. 1961).

C
At oral argument counsel for defendants urged that there were available publications similar to those before the court which had been adjudicated nonobscene by other courts and which, as comparable materials, would bind this court to a finding of nonobscenity of the materials in issue. Opportunity was allowed for submission of those publications. Two were received. They are magazine type items of the same general nature as Schedules C and D, entitled "My-O-My Volume II" with a sale price of $6 and "Togetherness" with a sale price of $5. "My-O-My" contains 30 pages of "Excitachrome" color photographs of nude males making love to one another. "Togetherness" contains 29 pages of "T.H.P. Vitra Color" color photographs of nude males and females with their genitalia juxtaposed and in each other's (and the viewer's) face. It is alleged that "Togetherness" was one of the items involved in the reversal of a state conviction of obscenity in Burgin v. South Carolina, 404 U.S. 806, 92 S.Ct. 46, 30 L.Ed.2d 39 (1971). "My-O-My" allegedly was among the magazines and films involved in the Supreme *420 Court reversal of a California conviction in Weiner v. California, 404 U.S. 988, 92 S.Ct. 534, 30 L.Ed.2d 539 (1971).
The comparability argument has no merit. This court must decide the obscenity of the materials before it on their merits, not on the merits of some other materials passed on by some other courts. Womack v. United States, 111 U.S. App. D.C. 8, 294 F. 2d 204 (D.C. Cir.1961). I fail to comprehend the argument that five of nine Supreme Court justices find one item to be nonobscene, such action establishes a "community standard" to be applied to other allegedly similar publications. Whether a specific item is obscene is an individual determination. An adjudication on one work cannot be binding, as a matter of law, on another.

IV
N.J.S.A. 2A:115-2 is constitutional.
"If men were angels no government would be necessary." James Madison, Federalist No. 51.
* * * [T]he police power is a sovereign right of the government existing essentially to protect the lives, health, morals, comfort, and general welfare of the people. [McSweeney v. Equitable Trust Co., 16 N.J. Misc. 193 (Sup. Ct. 1938 aff'd 127 N.J.L. 299 (E & A. 1941), app. dism. 315 U.S. 785, 62 S.Ct. 805, 86 L.Ed. 1191 (1941)]
The police power does not have its genesis in a written constitution. It is an indispensable attribute of our society, possessed by the state sovereignties before the adoption of the Federal Constitution. [Schmidt v. Board of Adjustment, Newark, 9 N.J. 405, 414 (1952)]
Government under our form of democracy has the responsibility of protecting the morals of its people. The obligation is basic and undisputed. [Adams Newark Theater Co. v. Newark, 22 N.J. 472, 478 (1956)]
The State has the power, in the interests of the common good, to enact all manner of laws reasonably designed for the protection of the public health, welfare, safety and morals. The exercise of the power may cause individual hardship or even limit the freedom of individual action; but so long as there is some degree of reasonable necessity to protect the legitimate interests of the public, and the regulation resulting from the use of the power is not arbitrary or oppressive, the greater good for the greater number must prevail and *421 individual inconveniences must be suffered as the price to be paid for living in a well ordered society * * * Mr. Justice Holmes, in Noble State Bank v. Haskell, 219 U.S. 104, 31 S.Ct. 186, 188, 55 L.Ed. 112, 32 L.R.A. (N.S.) 1062 (1911), mentions that this power
"* * * may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare."
[Vanderbilt, C.J. in Gundaker Central Motors v. Gassert, 23 N.J. 71, 78 (1956)]
Pursuant to that police power the Legislature of New Jersey, beginning in 1868, enacted legislation prohibiting the sale or distribution of obscene or indecent literature (L. 1868, c. 536, p. 1160). The basic enactment  carried through a series of supplements and revisions  currently appears as N.J.S.A. 2A:115-2, supra.
Unchecked police power leads inevitably to a police state. Wise limitations were placed on the federal power by the Bill of Rights and in our State Constitution (1947) by Article I, "Rights and Privileges." "But the police power may not be exercised so as to be repugnant to the fundamental constitutional rights guaranteed to all citizens." Gundaker Central Motors v. Gassert, supra, at 79.
Under the police power government does have the right to regulate public morality. Our statute, N.J.S.A. 2A:115-2, supra, prohibting exposing to the view of another or distribution of obscene and indecent materials, is constitutional. Roth v. United States,[2] 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); State v. Hudson County News Co., supra. The First Amendment raises no bar to such a statute since it does not encompass obscenity. Roth, supra. "* * * [T]he States retain broad power to regulate obscenity." *422 Stanley v. Georgia,[3] 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).
Government's right to regulate private morality is more constricted. In this area there is both a practical limitation and a constitutional one as well. Insofar as obscenity is concerned it is a fact that in every age there has been a minority of people engrossed with perverted sex. No amount of legislation can change that. Government is in fact powerless to dictate private morality.[4] Constitutionally it is recognized that the First and Fourteenth Amendments have created a certain "zone of privacy" protected from government control. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Roe v. Wade, ___ U.S. ___, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Cf. State v. Clark, 58 N.J. 72 (1971).
It is also true that there are persons in every age who will pander to the perverted sexual engrossment of a minority by supplying them materials for a price. Government does have the right to punish such activity. It can, through its laws, make the suppliers run the risk of punishment if caught. Every penal law does that to the potential offender. In a similar fashion the laws against gambling do not punish the bettor but rather the bookmaker  for his is the public aspect of the activity.
*423 Therefore, N.J.S.A. 2A:115-2 is constitutional. In prosecutions under it (as in any criminal prosecution) the question of appellate review is whether there was sufficient factual and legal basis for a conviction. That review involves, among other things, whether the trier of the fact applied the correct definition of the crime  specifically, the correct definition of "obscenity." One of the basic purposes of appellate review is to ensure that all constitutional rights  not just those afforded by the First Amendment  have been observed. There is no reason to suggest that some sort of extraordinary procedure must be followed in a criminal prosecution for obscenity; that obscenity cases are sui generis; that trial by jury is somehow outmoded.

V

Applicable Standard Of Obscenity
What is a constitutionally acceptable definition of obscenity for the purpose of determining whether the publications should be returned? The plethora of opinions on the subject consider Roth v. United States, supra. as the leading case. Roth still stands for the proposition that obscenity is not "speech" protected by the First Amendment. Stanley v. Georgia, supra, reiterated that "the States retain broad power to regulate obscenity." State legislatures continue to accept that statement at face value; prosecutors bring charges; juries convict; state appellate courts affirm. Almost invariably the United States Supreme Court, since Roth, reverses. The states are left to wonder, with reason, whether "broad" also is a word having a different meaning than people usually ascribe to it.
Roth approved the definition of obscenity given by the trial judge. The charge there was as follows:
* * * The test is not whether it would arouse sexual desires or sexual impure thoughts in those comprising a particular segment of the community, the young, the immature or the highly prudish or would leave another segment, the scientific or highly educated or the so-called worldly-wise and sophisticated indifferent and unmoved. * * *
*424 The test in each case is the effect of the book, picture or publication considered as a whole, not upon any particular class, but upon all those whom it is likely to reach. In other words, you determine its impact upon the average person in the community. The books, pictures and circulars must be judged as a whole, in their entire context, and you are not to consider detached or separate portions in reaching a conclusion. You judge the circulars, pictures and publications which have been put in evidnce by present-day standards of the community. You may ask yourselves does it offend the common conscience of the community by present-day standards.
In this case, ladies and gentlemen of the jury, you and you alone are the exclusive judges of what the common conscience of the community is, and in determining that conscience you are to consider the community as a whole, young and old, educated and uneducated, the religious and the irreligious  men, women and children. [77 S.Ct. at 1312]
The federal conviction was affirmed by a 6-3 vote.
In the companion case of Alberts the Supreme Court approved the test applied by the trial judge sitting without a jury, to wit: "whether the material has `a substantial tendency to deprave or corrupt its readers by inciting lascivious thoughts or arousing lustful desires.'" 77 S.Ct. at 1310. It found that the trial judge had judged "each item as a whole as it would affect the normal person." 77 S.Ct. at 1312. The state conviction was affirmed by a 7-2 vote.
Roth also mentioned with approval the definition of obscenity suggested by the A.L.I. Model Penal Code § 207.10 (2) (Tent. Draft No. 6, 1957);
* * * A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters * * *
Under any of the above definitions I would find the materials in Schedules A and C to be obscene.
In Roth the test is synthesized in this language: "Obscene material is material which deals with sex in a manner appealing to prurient interest." Whether the material appeals *425 to a prurient interest is not to be subjectively adjudged but rather objectively, that is, "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to the prurient interest." That definition is comprehensible to a judge. It would, of course, require amplification and further defining of terms to be understandable to a jury.
The problem is one of semantics. The semantics problem is two-fold: one for judges, the other for jurors. The basic words are "obscene and indecent." A judge must first comprehend in a legal sense what those words connote and then in a practical sense make them understandable to jurors in his charge so that their judgment will be properly directed. The trial judge in Roth fulfilled his function in explaining what is meant by "obscene or indecent." The standards applied by the California judge can be said to be fairly understandable to laymen. The A.L.I. and Roth tests are more difficult since they add other terms which require added definition to jurors by a trial judge.
The following language in Roth is important to note because the emphasized words have given rise to the multiplicity of opinions in the obscenity field:
All ideas having even the slightest redeeming social importance  unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion  have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests. But implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance. (at 1309)
The clear meaning of that language is that obscenity is something without redeeming social importance. If a thing is obscene it in fact has no redeeming social importance. But one must first determine what is obscene and that is done on the basis of the synthesized Roth definition set forth above. "Without redeeming social importance" is the result of being obscene. It is not an element in the definition of obscene.
*426 The use of the word "utterly" has caused innumerable problems of interpretation. Its use in Roth is mostly casual. It is both unfortunate and illogical.
"Utterly" means completely, absolutely, entirely. The American Heritage Dictionary of the English Language (1969, 1970). It is an absolute. Absolutes are foreign to the criminal law. The law perforce functions with more practical terms. A jury does not have to be utterly or absolutely certain of guilt before a guilty verdict can be returned; it need be satisfied only beyond a reasonable doubt of guilt. How could jurors ever return a verdict of guilty in an obscenity case if they are told the item must be found to be completely or absolutely without redeeming social importance? What is "social importance?" The term includes "literally or scientific or artistic value or any other form of social importance." Jacobellis v. Ohio, 378 U.S 184, 191, 84 S.Ct. 1676, 1680, 12 L.Ed.2d 793 (1964). Literary, scientific or artistic values are comprehended in the dominant theme requirement of Roth. But in defining "social importance," using the words "any other form of social importance" adds nothing. The phrase to be defined is thus defined by itself. Such definition is valueless. Does the fact that a book has hard rather than soft covers give it "social importance" of the most infinitesimal value so as to preclude a finding of "utterly without"? If a magazine uses full color photos rather than black and white photos does that give it some measure of "social importance" which will redeem it from being declared obscene?
What is "redeeming" social value? "Redeem," in the sense in which it is used, means "to make up for." The American Heritage Dictionary, supra. For example, one may say that the play was redeemed by the acting. In other words, the play was terrible but on balance it was worth going to the theater because the acting was excellent. Literally, "redeem" means to buy back. Therefore, in order that a work have social importance to redeem it from its valuelessness, that importance must have value. Something more than a *427 whiff or whisper of social importance is required in order to be redeeming. One slice of good apple does not redeem an otherwise rotten fruit salad. A work which contains nauseating recitals of human degradation is not redeemed because the author uses "Ph.D" after his name or asserts in a page or so of introductions that these are clinical studies of abnormal behavior.
Roth set forth a test which could be understood. "Utterly without redeeming social importance" was not part of its test.
In Manual Enterprises, Inc. v. Day, 370 U.S. 473, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962), the two-fold concept of obscenity enunciated in Roth was considered in the context of prosecution for mailing magazines or photographs of nude males. The conviction was reversed. Two justices did so on the basis of nonobscenity; three did so on procedural grounds; two took no part in the decision; one simply concurred in the result and one dissented. Such a potpourri added nothing to Roth.
Jacobellis v. Ohio, supra, is interesting mainly because it is difficult to discover whether it adds anything to a legal understanding of obscenity. The holding is quite simple. A state court conviction of exhibiting an obscene film was reversed by a 6-3 majority. The three dissenters felt there was no need for federal intrusion; that there was sufficient evidence to sustain the conviction; that the court was not an "ultimate censor." Two of the concurring justices, Justices Black and Douglas, did so because of their previously stated position that under the First Amendment there can be no crime of obscenity. Justice Stewart concurred because he felt simply that the picture was not "hard-core" pornography. Justice Goldberg concurred because the one objectionable love scene in the film was "fragmentary and fleeting" and therefore the dominant theme requirement was not present. He also concurred in Justice Brennan's plurality opinion. Justice White merely concurred in the judgment.
*428 Thus, Justice Brennan's opinion expressed the thinking of but two of the nine. It is in that opinion that is found the so-called "third prong" for the test of obscenity, viz, "utterly without redeeming social importance."[5]
As discussed in detail, supra, the phrase is a meaningless appendage to any workable definition of obscenity. If judges grope, as they have, to fathom such a Delphic phrase, how can they ever interpret it to a jury?
The Jacobellis plurality opinion in which two justices concurred, by way of dictum, also suggests that the community standard test of Roth means a "national standard"  and this because mandated as a matter of "due process" and "equal protection". No one has ever suggested that due process or equal protection mean that the laws of each state must be the same. Less than unanimous verdicts in criminal cases are constitutionally permitted to some states even though the vast majoriy of states require unanimity. It may be a crime to carry a weapon in one state without a permit, yet perfectly legal to do so in another  and it is not seriously suggested that this varying use of their reserved powers by the states violates the equal protection clause. Roth itself approved three separate and varying ways of defining obscenity  none of which mentioned a national standard.
Our Supreme Court had adopted the "national standard" prior to Jacobellis. State v. Hudson County News Co., 41 N.J. 247, 266 (1963). If the trier of fact is to be entrusted without more, to apply that standard poses no problem. If, however, a jury must have presented to it proof of a national standard, grave problems indeed are raised.
A standard is an "acknowledged measure of comparison for quantitative or qualitative value; criteron; norm." The *429 American Heritage Dictionary, supra. What sort of Gallup poll could be taken to establish such standard? If it were taken, how valid would be the sample? Of what value would be the opinions of "experts" as to a national standard, other than guesswork based on their own subjective tastes'. We trust jurors with the standard of the "reasonable man." Assuredly that standard probably varies from place to place. In final analysis, just as beauty is in the eye of the beholder, concepts such as negligence, reasonable doubt, lewdness, obscenity, fair recompense, etc., rest in the concurrent judgment of the requisite number of jurors under the facts of each specific case and under the explanatory charge of the trial judge. One can say no more than that, and beyond that community standards, be they local or national are at best vague.
In this case I find that in any part of this nation the items in Schedules A and C are obscene to the average person.
In A Book Named "John Cleland's Memoirs Of A Woman Of Pleasure" v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), a state court determination of obscenity in a civil proceeding was reversed. Three justices held the book to be nonobscene; two concurred though not in the plurality opinion; one, Justice Douglas, held to his position that under the First Amendment there could be no obscenity; three justices vigorously dissented. Justice Black's concurrence was based on his oft-stated view that under the First and Fourteenth Amendments no form of expression can be restricted by government. Justice Stewart concurred based on his dissent in Ginsburg, infra, 86 S.Ct. at 956. There he advanced his theory of "hard-core pornography" as the sole constitutional basis for a declaration of obscenity. At best, then, can it be said that four of the nine justices agreed with the rationale of the lead opinion. That opinion is based on Roth, but with the third distinctive element of "utterly without redeeming social importance" added by a two-justice minority in Jacobellis, supra.
If the accused is a purveyor of the material and is "pandering" it, that is certainly an added fact which jurors *430 are entitled to consider in reaching their ultimate judgment. Ginsburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966).
The foregoing summarizes the essential United States Supreme Court declarations on obscenity from Roth to date.
Legal scholars may try to find hidden meanings. They may pore over opinions of justices for clues to possible future rulings. They may speculate on changes in court membership, or predict likely trends. See California v. LaRue, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342, 12 Cr. L. 3027 (1972). But a trial judge may not. He must search out and determine the present state of the law and apply it as he finds it or instruct a jury accordingly.
Beyond a 7-2 decision in Roth affirming a state prosecution, and the two-pronged test enunciated therein, I cannot say that I feel an abiding conviction to a moral certainty as to the law of obscenity. Roth is the test I apply, modified solely by the requirement of a national standard. State v. Hudson County News Co., 41 N.J. 247, supra.

VI
It is never amiss to rethink basic concepts.
Were the average citizen to read a list of the publications and films reviewed by the United States Supreme Court (and held not obscene) after being held obscene by various state courts, he would be struck by the remarkable fact that had all of them never appeared on the face of the earth, this nation would have been lessened not one whit in greatness. In other words, in retrospect, had the United States Supreme Court let stand convictions entered by juries and affirmed on state appellate review, the principles which the First Amendment sought to protect would remain firm and intact.
The underlying reason for protecting a right freely to speak or freely to print is that the people may be informed. In a free society, if the people are informed and then structure their laws accordingly, a minority can be heard to complain *431 but must nevertheless live under the rule of law constituted by the majority. The First Amendment seeks to keep sources of information available to the people. If the people want to know about sexual intercourse, or sodomy or buggery or animalism, or fellatio, or cunnilinguism, or masturbation, or homosexuality or lesbianism, or sadism or masochism, or nymphomania, they have a right to have sources available to them for that knowledge. Once they know what those subjects are all about, they may decide whether some or all of them shall be regulated. But no one suggests that such information is unavailable in medical or scientific journals, in serious studies on sexual behavior, or even in how-to-do handbooks for couples planning matrimony. Indeed, there is nothing new under the sun in the sexual field. The human body has changed in no essential way since time began, nor has the human mind in either its good or evil bents. The people have acted on knowledge available to them, and indeed set up a rule of law forbidding certain conduct and specifically prohibiting the distribution of obscene and indecent materials. That is why, as Roth states, obscenity is outside the protection of the First Amendment.
If the First Amendment  enacted to protect the free expression of ideas; to allow the people to call a tyrant a tyrant or a public official a thief; with impunity to freely advocate change or a complete turnabout in their government  if that First Amendment has any connection with the type publication in Schedules A and C, it is ephemeral. When one reads the extensive and numerous opinions penned by federal and state courts in the field of obscenity and examines in the descriptive footnotes of those cases the actual materials involved which led to the pronouncements, one cannot but be shocked at the tremendous waste of judicial time. The subject matter is not the advocacy of unpopular ideas; it is literary garbage. If the country had not seen any one of those publications, it would in no way be less free or less strong or less democratic. If the criminal *432 judicial system has become bogged down by an excess of pretrial maneuverings, the obscenity cases have more than contributed their share. Two facts emerge from all the cases with startling clarity: (1) those charged with the sale of obscene materials do not want a jury of 12 average citizens of the community to determine their guilt or innocence; (2) when that determination is made by a jury the verdict is overwhelmingly that of guilt  unanimously and beyond a reasonable doubt.
Chief Justice Weintraub ably pointed up the problem presented to state trial courts in his concurring opinion in State v. Funicello, 60 N.J. 60 (1972). His language there is peculiarly apt to the obscenity field.
If Mr. Justice Holmes was correct when he said the life of the law is experience and not logic, it is understandable that State Judges do not believe their federal counterparts are better informed to make value judgments in this area of intense State experience. Indeed a lack of realism is the persistent criticism of the federal decisions to which I have referred.
Many citizens continue to charge the State judiciary with the shortcomings in this critical area, while the State judiciary chafes because it is unable to do what it believes ought to be done, and to boot, it cannot find out in some expeditious way precisely what the Federal Supreme Court wants it to do.
The problem is aggravated by the fact that the Federal Supreme Court does not have the options available to the State Supreme Court. Whereas the State Supreme Court can make new law at a non-constitutional level, thus leaving the Legislature free to disagree and the Court itself free to change its mind more comfortably if experience should reveal it erred, the Federal Supreme Court cannot itself lay down a rule without attributing it to some constitutional command. It might have been more serviceable merely to have found a federal interest in a subject justifying congressional action rather than to attribute some final solution to the Constitution itself. But that is not the course the Federal Supreme Court pursued. Rather the Court fashioned its own rules and said the Constitution made it do so.
In that process the Federal Supreme Court had to read the Consitution to embrace subjects never thought to be within the Constitution's reach. Indeed the outside limits of the process are not yet visible. After all, good law is a matter of "fairness," and one need but insist that a given rule is "fundamentally" unfair to call upon the Constitution to establish his view. The tendency is thus to claim "constitutional" moment in matters which, in my appraisal, are quite *433 minimal in a scheme of values. The more the Constitution is found to be intolerant of disagreement upon arguable issues, the deadlier becomes the grip upon the genius of men. The price of such intolerance may be sterility. It is true that on occasions, the Federal Supreme Court suggests a new constitutional rule will not deny the States an opportunity to devise another approach. [citations omitted] But no one seems to have found elbow room.
Commonly a constitutional question involves no more than a value judgment upon a factual complex rather than an evident application of a precise rule of law, and indeed a value judgment which inevitably reflects the seasoning and experience of the one who judges. Federal trial judges are thus asked to "review" the judgments of the State Court by no more than a substitution of their factual evaluations for those of the State Court.
My point is that the doctrines of the Federal Supreme Court have led to an impossible situation. There is more than enough work for both judicial systems. Good management calls for husbanding of their energies and the elimination of conflicting judgments which really do little if anything to advance justice. [Emphasis supplied]
If a man stands on a street corner and exposes his genitals, the judicial system has no trouble in prosecuting and convicting him under N.J.S.A. 2A:115-1 which provides that
Any person who commits open lewdness or a notorious act of public indecency, grossly scandalous and tending to debauch the morals and manners of the people, or in private commits an act of lewdness or carnal indecency with another, grossly scandalous and tending to debauch the morals and manners of the people, is guilty of a misdemeanor.
In such case we have no intellectual difficulty in trusting 12 average citizens to apply the standard of proof beyond a reasonable doubt to a charge involving words like "lewdness" a "nortorious act of public indecency," or "grossly scandalous," or "debauch," or "carnal indecency." The law concludes, and rightly so, that the average person has a pretty fair comprehension of what those words mean and that with added clarification supplied by a judge they have the capacity to make the required judgment.
Yet if the same man has a photograph of himself taken wtih his genitals exposed and posed alongside of another male with his mouth open and an anticipatory smile on his *434 face; and if that photograph is placed in a magazine along with a series of similar photographs, and that magazine is sold from public newsstands, it is urged that the judicial system cannot prosecute and convict the purveyor of the magazine because the First Amendment is somehow involved and it is difficult for jurors to comprehend the words "obscene or indecent" given adequate judicial explanation. There is no logic to the argument.
Similarly, if a man engages in fellatio with another man, or woman, or child in public, there would be no difficulty in prosecuting or convicting him. That is also true in a case of cunnilinguism, sodomy or buggery (N.J.S.A. 2A:143-1) or sadism (N.J.S.A. 2A:90-1 and 2A:90-2). Our Legislature has declared such conduct to be a crime no matter what the private thoughts of some citizens be. Again a jury is trusted to understand the definitions of those crimes as explained by a judge.
If photographs are taken of such activities or simulations of such activities, placed in a magazine along with other similar photographs, and placed for display and sale at a public newsstand, and if the Legislature makes such display and sale a crime, it is difficult to follow the argument that such crime cannot be prosecuted in the traditional manner  simply because the cry "First Amendment" is raised.
The argument is made that these forms of "expression" cannot demonstrably be said to cause harm. Cannot it reasonably be asked what good do they do? And if the answer comes back to the negative  overwhelmingly (as it does) from state legislatures, from Congress and from the community speaking through its jurors  should not judges wonder that they can find a constitutional right involved?
If a prosecutor should charge a local museum with uttering obscene material because it contains nude statuary, I think we can trust the good judgment of a grand and (if necessary) a trial jury to handle it. After all, the test to be applied is that of the "average man," not that of a puritanical prude. In like fashion, our First Amendment sensibilities *435 need not be unduly aroused if a prosecutor should seek to indict the local library for having a copy of Dante's Inferno on its shelves. It would be the act of an incompetent. But obviously, in this case we are not concerned with that situation.
If a prosecutor should attempt to use the criminal process (rather than the injunctive avenue provided by N.J.S.A. 2A:115-3.5 et seq.) to impose a county-wide "ban" on a particular publication by sweeping all shelves clean, appropriate relief is available in the federal courts (Cine-Com Theatres Eastern States, Inc. v. Lordi, 351 F. Supp. 42 (D.C.N.J. 1972), if not in our state system. Cf. Keuper v. Wilson, 111 N.J. Super. 502 (Ch. Div. 1970). The books in Schedule A fulfill no need at all. If they should disappear from the American scene, the human spirit would in no sense be diminished. In their fantasized, explicit, vulgar detailing of varying mixtures of the sexual activities listed above, those books are obscene.
The same principles are applicable to the publications listed in Schedule C. What is portrayed therein is designed solely to appeal to a prurient interest. It is not protected by the First Amendment. Those items may not be returned. On the other hand, those items in Schedule D may arguably be held not to have as a dominant theme an appeal to the prurient interest. They are to be returned.
The principle that emerges is not that judges will not ultimately review any constitutional question involved, but rather that there is no need for an extraordinary procedure requiring that they do so before a jury has made its initial determinations.
Due process provides for appellate review. The First Amendment protects freedom of expression of ideas whose dominant theme is not an appeal to prurient interest, or is not libellous, Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), or is not riot or panic-provoking, Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). There is no reason to believe *436 that having the judicial process find some modes of expression to be obscene will in any way shatter our constitutional structure. There is good reason to conceive that if we try to use meaningless definitions, the system will collapse because of its unworkability.
I reject the "utterly without redeeming social value" as a third separate and distinct requirement before material can be deemed "obscene" and unprotected by the First Amendment. It adds nothing to the "two-pronged" Roth test which I accept as a generalized statement of the proposition. In other words, I believe the Roth test is to guide judges in their comprehension of the applicable constitutional principles but is not mandatory language to be charged to a jury.
In taking that position I recognize that I differ with the United States District Court for the District of New Jersey. Cine-Com Theatres Eastern States, Inc. v. Lordi, supra. I am free to do so, albeit comity requires due deference to its opinion as a parallel court of equal dignity. State v. Coleman, 46 N.J. 16 (1965). Cine-Com held unconstitutional the definition of obscenity enacted by New Jersey Legislature. N.J.S.A. 2A:115-1.1 became effective February 15, 1972. It provides:
The word "obscene" wherever it appears in the chapter to which this act is a supplement shall mean that which to the average person, applying contemporary community standards, when considered as a whole, has as its dominant theme or purpose an appeal to prurient interest.
As part of the enactment the Legislature set forth its findings, which are codified as N.J.S.A. 2A:115-1.1a:
The Legislature finds that the standards of obscenity now enunciated in chapter 115 of Title 2A of the New Jersey Statutes as amended and supplemented in recent years is unnecessarily permissive and a hindrance to effective legal action against obscene matter. The Legislature further finds that such unnecessary permissiveness has resulted from the incorporation into New Jersey Statutes of language from influential opinions authored by certain United States Supreme Court justices; which language, however, does not represent *437 binding majority decisions of the Supreme Court and, accordingly, need not bind the Legislature or the Judiciary of this State. The Legislature further finds that the most recent binding definition of "obscenity" enunciated by the United States Supreme Court is represented by section 1 of chapter 165, laws of 1962, prior to subsequent amendments; and that said subsequent amendments ought to be repealed in order to reestablish a workable definition of "obscenity" within the framework of our statutory law, and that certain other changes should be made in other statutes for the purpose of consistency.
The Legislature was clearly returning to the Roth standards by eliminating the Jacobellis requirement of "utterly without redeeming social importance." That requirement had been included by an amendment (effective July 21, 1966) to the original definition. Between July 21, 1966 and February 16, 1972, N.J.S.A. 2A:115-1 reads as follows:
(a) The word "obscene" wherever it appears in the chapter to which this act is a supplement shall mean that which to the average person, applying contemporary community standards, when considered as a whole, has as its dominant theme or purpose an appeal to prurient interest.
(b) Any book, publication, picture, writing, record or other mechanical or electronic audio or visual reproduction or other material shall be obscene within the meaning of subsection (a) hereof if it is established that:
(1) The dominant theme of the material taken as a whole appeals to a prurient interest;
(2) The material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and
(3) The material is utterly without redeeming social value.
From its original enactment in 1962, until July 21, 1966, it had read as follows:
The word "obscene" wherever it appears in the chapter to which this act is a supplement shall mean that which to the average person, applying contemporary community standards, when considered as a whole, has as its dominant theme or purpose an appeal to prurient interest.
*438 The foregoing discussion indicates this court's agreement with that legislative position. Applying that definition I find the material set forth in Schedules A and C to be obscene; those in Schedules B and D not to be obscene. The prosecutor is ordered to return the latter; defendants' motion is denied as to the former.
NOTES
[*] The schedules referred to in the opinion are omitted for purposes of publication.
[1] A perusal of the titles set forth in the schedules would indicate, without more, than an adequate showing of scienter was present. State v. Hudson County News Co., 35 N.J. 284, 294 (1961).
[2] The federal statute in Roth prohibited the mailing of "obscene, lewd, lascivious or filthy book[s]." The Cailfornia statute in the companion case of Alberts v. California, prohibited "obscene or indecent" writings, etc., in a statute very similar to N.J.S.A. 2A:115-2. Both statutes survived a constitutional attack based on vagueness of the language.
[3] Under our statute, N.J.S.A. 2A:115-2, supra, a case such as Stanley never would have arisen. Our statute does not make criminal private possession of obscene materials.
[4] It can regulate private morality where such conduct has a public aspect. If, for example, a married couple should copulate in a crowded school yard, such activity could be criminally prosecuted as a common law nuisance under N.J.S.A. 2A:85-1. The government can also regulate private morality where the activity in and of itself affronts publicly accepted standards of human conduct. Hence, for example, there are criminal laws prohibiting lewdness (N.J.S.A. 2A:115-1) and sodomy or bestiality (N.J.S.A. 2A:143-1).
[5] Whatever else may be unclear, it is patent that any discussion of that phrase in Jacobellis was by way of obiter dictum. As Justice Goldberg pointed out, the film "The Lovers" did not meet the Roth tests of obscenity because its dominent theme was not an appeal to prurient interest.